IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


STEVE ROBERT DURAN,

        Applicant,

v.                                                CIV 10-0743 JB/GBW

ERASMO BRAVO, Warden,
Guadalupe County Correctional
Facility, and GARY KING, New Mexico
Attorney General,

        Respondents.

<u>PROPOSED FINDINGS AND RECOMMENDED DISPOSITION</u>

        THIS MATTER is before the Court on Petitioner Steve Duran's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 *(doc. 1)* and on Duran's motion for an evidentiary hearing (*doc. 16*).   Since Duran filed his petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), its standards apply to this case.  *E.g., Abdul-Kabir v. Quarterman,* 550 U.S. 233, 246 (2007); *DeLozier v. Sirmons,* 531 F.3d 1306, 1319 (10th Cir. 2008).  Because all of the issues can be resolved on the record before me, an evidentiary hearing is unnecessary and I recommend that Duran's request for one be denied.  *Sandoval v. Ulibarri*, 548 F.3d 902, 915-16 (10th Cir. 2008).  After a careful review of the record and pleadings in this case, I further recommend that Duran's petition be denied on the merits.

FACTUAL BACKGROUND

On the night of January 13, 2004, Ricardo "Ricky" Gallegos was fatally shot six times at a trailer home he was occupying at 1017 Sunrise in Clovis, New Mexico.  *T2 at 4:13, 4:27.*[1] His live-in girlfriend, Mary Finnell, was found at the scene huddled over Gallegos' body, pleading for him to wake up.  *T2 at 10:03-10:04.*  She told police that she had been with Gallegos shortly before his murder and had observed Steve Duran draw a gun on Gallegos during an argument inside the trailer.  *T2 at 10:07.*  In fear for her life, Finnell climbed out of a window and ran across the street to her mother's home.  *T2 at 10:08-10:09.*  Once there, she heard gun shots and then saw Duran leave the home at 1017 Sunrise, enter his vehicle that was parked outside, and drive away.  *T2 at 10:09.*  Although she acknowledged that she had not seen Duran shoot Gallegos, Finnell told police that Duran was the killer and called out repeatedly that she "didn't know why Stevie done this."  *T2 at 10:06-10:07.*

At the scene, police found large quantities of blood, various tissue and brain matter, and eight 9-millimeter bullet casings.  *T2 at 2:13, 2:37-2:39.*  While seven casings and most of the body matter were found inside the trailer, small amounts of matter and one casing

---

[1] Unless otherwise indicated, citations to the proceedings in this case are to the ForTheRecord ("FTR") audio recordings contained on four compact discs.  Citations to the trial will first list the day of the trial, *e.g.*, *T1*, and then the time on the FTR recording when the proceedings occurred.  T1 corresponds to September 26, 2005; T2 to September 27, 2005; T3 to September 28, 2005; and T4 to September 29, 2005.

were found just outside the front door. *T2 at 2:37-2:40.* Scuff marks on the floor and objects knocked onto the ground indicated that a struggle had taken place. *T2 at 2:38, 3:07.* One of Gallegos' pants pockets was pulled inside out, and a matchbook and a card with names on it were found on the ground near the body. *T2 at 2:41.* No weapon was recovered at the scene. *T2 at 11:07.*

Early the following morning, police found the vehicle that Finnell had identified approximately 0.6 miles from the crime scene, abandoned on the side of a road. *T3 at 9:24, 11:22.* The vehicle was a silver Toyota 4-Runner, a type of pickup truck. *T3 at 9:26-9:27.* Inside the truck, police found a recent utility bill that listed Duran's name and the address of a home located at 1017 Delta. *T3 at 9:30-9:31.* After obtaining a search warrant for 1017 Delta, police entered the home and found no one present. *T3 at 9:31-9:32.* However, police did find narcotics, drug paraphernalia, two shotgun shell rounds, and a 9-millimeter bullet. *T3 at 9:36-9:38.* Police also found various clothes that had small blood smears: a dark colored jacket, a pair of white tennis shoes, a pair of overalls, and boxer shorts. *T3 at 9:33, 9:48-9:52.* Blood was also found on the outside and inside of Duran's truck, including the floor mat, gear shift, and driver's side door seal. *T2 at 2:22-2:32.*

In late January of 2004, a fugitive task force located Duran in a home on the west side of Albuquerque. *T2 at 1:07-1:08.* Duran was found crouched in the corner of the living room, and arresting officers observed that his appearance was different from the description they had received. *T2 at 1:09-1:10.* They were told Duran had a beard and

3

black hair, but his hair was dyed "reddish-orange" and his facial hair was shaved off.  *T2 at 1:10.*

After Duran was taken to a detention center outside of Albuquerque, Officer David Yoakum arrived to transport Duran back to Clovis.  *T2 at 1:11*; *T3 at 10:21-10:22.*  Before Yoakum issued *Miranda* warnings, he asked Duran why he had dyed his hair.  *T3 at 10:23.* Duran responded that he was running, and when Yoakum asked "from who?" Duran replied "you guys."  *T3 at 10:23.*

Once in Clovis, Duran agreed to provide a recorded statement to Officer Yoakum after receiving his *Miranda* warnings.  *T3 at 10:33-10:34.*  In the statement, Duran said that he visited Gallegos' home to purchase heroin and admitted that the two had argued.  *See transcript in Record Proper* at 467-469.[2]  However, Duran stated that after Gallegos had given him some drugs, "some Mexicans and stuff" emerged from another room within the home and began arguing with Gallegos.  *RP* at 469-470.  Duran said he and Finnell both "took off" and that he drove away in his truck.  *RP* at 470.  Duran explained that he abandoned his truck because the Mexicans "chased my ass down all the way to Prince,*"* after which he ran through a field and hitched a ride to the other side of town.  *RP* at 470.  Duran further stated that he did not return to his house and that the blood found on his clothes was his own from heroin injections.  *RP* at 470-471.

_____

[2] Subsequent citations to the Record Proper will be abbreviated as "*RP* at __."

At trial, Duran testified that two Mexicans had been in Gallegos' home before he arrived there.  *T3 at 2:52, 3:06.*  He said that, before he ran away, one of them drew a gun and shot Gallegos in the leg.  *T3 at 2:53, 3:04.*  He said that the other Mexican also appeared to have a gun tucked into his pants, although Duran did not see a second gun.  *T3 at 3:06, 3:39.*  Duran testified that the blood found inside his Toyota 4-Runner came from his heroin injections, scrapes on his hands from his work as a mechanic, and also from a serious cut that he sustained to his index finger when entering the truck.  *T3 at 3:02-3:03, 3:24.*  Duran showed the jury a scar on his finger and swore that none of the blood found in his truck or on his clothes was Gallegos'.  *T3 at 3:03, 3:24.*

Duran also testified that he knew the Mexicans, although not very well, but would not testify to anything else he witnessed because they knew who he was and would come after him or his family if he was a "rat."  *T3 at 2:54, 3:07.*  Duran said that he was Gallegos' friend and had protected him when they were both in prison together, but could do nothing this time because the Mexicans had guns and Duran did not.  *T3 at 2:43-2:44, 3:08-3:09, 3:34, 3:36-3:47.*  He explained that he had dyed his hair because he believed the Mexicans were hunting him and he was scared of them.  *T3 at 3:09-3:10.*  He said that Finnell knew who the Mexicans were, and implied that she was lying about their presence because she was also afraid of them.  *T3 at 3:05.*  Duran testified that, after he abandoned his truck, he eventually hitched a ride to 1017 Delta and left his clothes there by a washing machine.  *T3 at 2:57-3:01.*

5

On cross-examination, Duran admitted that the narcotics and paraphernalia found at 1017 Delta were his. *T3 at 3:15, 3:23.* Duran also admitted that he did not see another vehicle parked outside the trailer or on the street at the time of the murder. *T3 at 3:37.* He explained that he had not told Officer Yoakum that he had observed guns or Gallegos being shot in the leg because he was afraid of the Mexicans and did not trust Yoakum, who he said threatened him. *T3 at 3:30, 3:45-3:48.* The prosecutor impeached Duran over his statement to Yoakum that he had not returned to "his house" after the murder, but Duran testified that he was referring to a home he owned, at a different location. *T3 at* 3:29. Duran swore that he did return to 1017 Delta, his sister's home, after the murder. *T3 at 3:29.* The prosecutor also impeached Duran with two prior felony convictions, for voluntary manslaughter and battery on a police officer. *T3 at 3:13-3:14.* The prosecutor stated the names and degrees of the felonies, but Duran testified to some of the details of the crimes of his own volition. *T3 at 3:14, 3:20-3:22.*

At trial, Finnell testified that no one else was present at the trailer, no other vehicles were parked outside, and that she had never interacted with the Mexican Mafia before. *T1 at 3:54-3:55, 5:02.* She testified that Gallegos had a habit of keeping a large roll of money in his right pants pocket, and that Duran had witnessed him remove the money and count it a day or two before the murder. *T1 at 3:26-3:27, 4:12.* On the night of the murder, she said that Gallegos had about $500 in his pocket. *T1 at 3:28.* Finnell also stated that on New Year's Eve of 2003, approximately two weeks before the murder, Duran had come over to

6

their home with a gun and Gallegos and Duran had fired the gun into the air together outside at the turn of the year.  *T1 at 3:33-3:34.*

Finnell testified that around 7:00 p.m. on the night of the murder, Duran came over after she and Gallegos had eaten dinner and argued with Gallegos over money.  *T1 at 3:47-3:49.*  She was in the bedroom when Duran arrived but walked out to the hallway, where she could see both of them.  *T1 at 3:49-3:50.*  Finnell stated that the argument escalated, and Duran said that if Gallegos did not give him the money, he would shoot Gallegos.  *T1 at 3:50.*  She saw Duran draw a gun, then panicked, ran back to the bedroom, and climbed out the window.  *T1 at 3:50-3:52.*  Outside, she went by the open front door and heard two click sounds, which she believed came from Duran's gun and indicated that it "was gonna get ready to get used."  *T1 at 3:53-3:54.*

After running to her mother's house across the street, Finnell asked her mother to dial 911 because she could not handle the phone.  *T1 at 3:55-3:56.*  Finnell then attempted to return to the trailer home, but her mother stopped her.  *T1 at 3:57.*  At this point, Finnell heard six or seven gunshots and then saw Duran come out of the trailer, enter his truck, and drive away.  *T1 at 3:57-3:58.*  Finnell witnessed this from inside her mother's home and although it was dark out, she testified that she could see Duran by the light of a nearby streetlight.  *T1 at 3:58, 4:34; T2 at 8:53.*  She then ran back to her home and found Gallegos lying on his stomach inside.  *T1 at 3:59.*  She stayed with the body until the police arrived, and saw that his pants pockets were pulled inside-out.  *T1 at 3:59-4:02.*

7

On cross-examination, Finnell admitted that she did not actually see Duran cock his gun, and did not observe him shoot Gallegos or take his money.  *T1 at 4:25, 4:44.*  She also admitted that she had not told the police or grand jury about the incident when Duran had allegedly observed Gallegos counting his money shortly before the murder.  *T1 at 4:12-4:13.*  Additionally, Finnell was impeached over her grand jury testimony that Duran had come over with a gun on July 4 of 2003, instead of New Year's Eve of 2003.  *T1 at 4:14-4:15.*  Duran's counsel suggested that Finnell changed the date after learning that Duran was in jail on July 4.  *T1 at 4:15-4:17.*  Finnell admitted that she and Gallegos both used heroin once or twice a day.  *T1 at 4:08.*  Duran's counsel introduced the fact that Finnell had a prior felony conviction, but did not state its name or ask her any questions about it.  *T1 at 4:10.*

Finnell's mother, Rosa Lucero, and another neighbor, Robert Judd, both corroborated Finnell's story of the murder.  Lucero testified that after the gunshots, she observed only one man leave Gallegos' trailer and saw no one else leave or enter the home.  *T2 at 8:55-8:57.*  Lucero also said that she saw no other cars in the area or any cars follow the one that drove away.  *T2 at 8:55-8:57.*  Judd testified that he saw Duran leave the trailer after the gunshots and observed no one else by the trailer or any other vehicles.  *T1 at 5:39-5:43, 6:00.*  On cross-examination, Judd was impeached based on a report written by Officer Thomas Rollins.  *T1 at 5:45-5:50*; *see* report at RP 464.  According to the report, on the night of the murder Judd told Rollins that he did not see anyone leave Gallegos' home, that all he saw was the tail end of a car driving away, and that he thought it was a gold-colored

8

car. *T1 at 5:45-5:50*; *RP* at 464. Judd admitted that he had first identified Duran at the scene and the vehicle as silver only a couple weeks before trial, after speaking with the District Attorney's office. *T1 at 5:47-5:50.* A third neighbor, Rebecca Barela, testified that she saw a white vehicle drive past after hearing gunshots and saw no other vehicle follow it, but she could not testify to any other details of the scene. *T2 at 9:17-9:23.*

In addition to these eyewitnesses, Finnell's story was also corroborated by police testimony and an audio tape that was recorded at the crime scene and played for the jury. *T2 at 10:41-10:49.* On the tape, Finnell is heard sobbing and describing Duran's vehicle for a police officer. *T2 at 10:45-10:46.* She can also be heard telling an officer that "Stevie" had come over after dinner and that only her, Duran, and Gallegos were present in the home. *T2 at 10:41-10:43.* Officer Shawn Gore, who recorded the tape, testified that he stayed with Finnell after he arrived at the crime scene and that she never mentioned any individual other than Duran or changed her story. *T2 at 10:10-10:11.*

Other than police testimony regarding the items found at 1017 Delta, the circumstances under which Duran was found in Albuquerque, and the statements that he gave, the State presented no other evidence against Duran. No direct physical evidence linked Duran to the murder. Of the clothes found at 1017 Delta, only the jacket and tennis shoes underwent DNA testing, and a crime lab determined that the blood found on them was a positive match to Duran. *T3 at 9:57, 10:53-10:54.* Gallegos was excluded as a match for the blood found on these items. *T3 at 10:53-10:54.* The lab determined that all eight

recovered casings had been fired from the same handgun, but it could not determine which type of gun. *T2 at 2:17-2:18, 3:10.* The murder weapon was never found, and no fingerprints were taken from any of the surfaces or objects found inside Gallegos' home. *T3 at 11:26.* None of the blood or body matter found in and around Gallegos' home was sent to the crime lab for testing. *T2 at 3:03-3:06.*

By far the most significant physical evidence surrounding the case, however, was the blood found in Duran's truck. DNA testing on that blood had not been completed when the first trial date arrived. Consequently, both Duran and the State stipulated to a six-month continuance of trial because both sides believed it was "absolutely critical to the presentation of both the State's and the Defense's cases." *RP* at 86. Notwithstanding this continuance, this blood had still not been tested when the second trial date in September arrived. Duran's counsel decided not to request any further continuance, but instead moved unsuccessfully before trial to dismiss the case due to a speedy trial violation. *T1 at 8:05-8:58.* At the close of the State's evidence, Duran's counsel moved for a mistrial because the blood had not been tested. *CR-3.*[3] Throughout the trial, Duran and his counsel pressed this point and also moved for a new trial on the same ground after trial.[4] *RP* at 324-26.

_____

[3] "CR-3" refers to the cassette tape dated 9-28-05 with this title. This portion of Duran's trial was only recorded on a cassette tape and cannot be found on any of the FTR audio recordings.

[4] When the blood was not tested by the time of Duran's trial, his counsel lamented that the jury was forced to play a "guessing game." *T1 at 8:37-8:38.* His counsel argued repeatedly that the blood was critical and potentially very exculpatory

10

After none of these requests were granted and the blood still had not been tested at the time of Duran's sentencing hearing, his counsel moved again to dismiss the case, continue the sentencing hearing, or retry the case after the blood had been tested. *Sentencing at 1:06-1:13.*[5] These requests were denied. *Sentencing at 1:14.*

<u>PROCEDURAL BACKGROUND</u>

Following a four-day jury trial, Duran was found guilty of the following crimes: (1) Murder in the First Degree, contrary to NMSA 1978, § 30-2-1(A); (2) Possession of Methamphetamine, a fourth degree felony, contrary to NMSA 1978, § 30-31-2 & § 30-31-23; (3) Possession of Heroin, a fourth degree felony, contrary to NMSA 1978, § 30-31-2 & § 30-31-23; (4) Possession of Drug Paraphernalia, a misdemeanor, contrary to NMSA 1978, § 30-31-2 & § 30-31-25.1; and (5) Felon in Possession of a Firearm, a fourth degree felony, contrary to NMSA 1978, § 30-7-16. *RP* at 384-86, *as amended by RP* at 402-04. Duran was found not guilty of a charge of armed robbery. *RP* at 404. On March 1, 2006, Duran was

---

because Gallegos' autopsy had revealed that three of his bullet wounds had been inflicted at close range, *T2 at 4:38-4:41*, meaning the murderer would almost certainly have picked up some of his blood. *T4 at 10:11-10:12.* When being cross-examined on his statement that the blood found inside in his truck came from a cut on his finger, Duran retorted "if you don't believe me, test that blood." *T3 at 3:25.* The untested blood was the overwhelming theme of Duran's counsel's closing argument, where he called the absence of testing "inexcusable" and analogized the jury's factfinding job without the DNA results to "someone conducting surgery with a butter knife." *T4 at 9:51, 10:22.* Duran's counsel told the jury that "if this blood is Steve's, then he's innocent; if it's Ricky's, then he's guilty of it." *T4 at 9:48.*

[5] This citation refers to the FTR audio recording on the compact disc labeled "Sentencing" and dated February 28, 2006.

sentenced to a total term of life plus eighteen-and-one-half years incarceration.  *RP* at 385.

Duran filed a timely Notice of Appeal on March 29, 2006.  *RP* at 389-91.  Due to Duran's sentence of life imprisonment, his appeal went directly to the New Mexico Supreme Court (NMSC) pursuant to NMRA 12-102(A).  In an opinion filed December 18, 2008, the NMSC affirmed all of Duran's convictions but vacated a one-year firearm enhancement that had been applied to Duran's sentence for first degree murder.  *Doc. 10, Ex. 4* at 33.  On January 7, 2009, Duran filed a petition for state habeas relief that was summarily denied on February 1, 2010.  *Id.* at Ex. 5, Ex. 6 at 1-2.  After receiving an extension from the NMSC, Duran filed a Petition for a Writ of Certiorari on April 2, 2010.  *Id.* at Ex. 6 at 3-49, Ex. 7 at 1-29.  On May 25, 2010, the NMSC summarily denied certiorari.  *Id.* at Ex. 7 at 54.

Duran filed his federal habeas petition on August 6, 2010,[6] to which Respondents filed an answer on September 13, 2010.  *Docs. 1, 10.*  On December 9, 2010, Duran filed a response to Respondents' answer and also a motion to amend his petition and expand the

---

[6] By this Court's calculations, the deadline for Duran to file his federal habeas application under AEDPA's one-year statute of limitations was August 4, 2010.  28 U.S.C. § 2244(d)(1)(A).  Although Duran's petition was not filed until August 6, 2010, Rule 3(d) of the Rules Governing Habeas Corpus cases provides that "[a] paper filed by an inmate confined in an institution is timely if deposited in the institution's internal mailing system on or before the last day of filing."  Because Duran's petition contains a notarized statement declaring that the petition was placed in his prison mailing system on July 31, 2010, his petition was timely filed.  Respondents do not contest the timeliness of the petition.

record. *Docs. 19-20.* I granted Duran's motion in part, and amended his petition to include

five additional claims of ineffective assistance of counsel and one claim regarding the trial

court's denial of a mistrial due to the absence of DNA test results. *Docs. 23, 26, 30.* Because

Duran's motion appeared to be missing certain exhibits, I also filed an order to supplement

the record on February 28, 2011. *Doc. 24.* Although Duran responded and attached the

missing exhibits, *Doc. 28*, a Supreme Court decision issued after my order prohibits me

from considering materials that were not before the state courts that considered Duran's

claims on the merits. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398, 1400 (2011). As a result, I

cannot consider any new evidence submitted by Duran in my review of most of his claims.[7]

## STANDARD OF REVIEW

Under AEDPA standards, if a state court addressed a petitioner's claim "on the

merits," a federal court cannot grant an application for a writ of habeas corpus unless the

---

[7] After Duran's trial and sentencing, the district court ordered that the blood
found in Duran's truck "shall continue to be tested" and for the results to be sent to
Duran's counsel "immediately" upon their completion. *RP* at 405-406. Despite the
order, Duran did not receive results before appealing his case or filing his state habeas
petition. Although Duran subsequently received the results and has submitted them
along with his federal habeas petition, *Cullen* holds that they must have "no bearing" on
my review of claims adjudicated on the merits by a state court because they were not in
the record before the state courts. 131 S. Ct. at 1400. It is worth noting, however, that I
would recommend dismissal of Duran's claims even if I could consider Duran's new
evidence. According to the test results, some of the blood found in Duran's truck was
consistent with the DNA profile of Duran and some was consistent with the DNA
profile of Gallegos. *Doc. 28* at 15.

state decision was: (1) "contrary to, or involved an unreasonable application of, clearly

established Federal law," as determined by Supreme Court precedent; or was (2) "based

on an unreasonable determination of the facts in light of the evidence presented in the State

court proceeding." 28 U.S.C. § 2254(d). A state court decision is contrary to clearly

established federal law "if the state court arrives at a conclusion opposite to that reached

by [the Supreme Court] on a question of law or if the state court decides a case differently

than [the Supreme Court] has on a set of materially indistinguishable facts." *Douglas v.

Workman*, 560 F.3d 1156, 1170 (10th Cir. 2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 413

(2000)). A state court decision is an unreasonable application of federal law "if the state

court identifies the correct governing legal principle from [the Supreme Court's] decisions

but unreasonably applies that principle to the facts of the prisoner's case." *Id.* (quoting

*Williams*, 529 U.S. at 414). Factual issues determined by the state court are presumed

correct, and the applicant may only rebut them by clear and convincing evidence. 28 U.S.C.

§ 2241(e)(1).

The Supreme Court has recently added that when a state court has determined that

a claim lacks merit, federal habeas relief is precluded "so long as 'fairminded jurists could

disagree' on the correctness of the state court's decision." *Harrington v. Richter,* 131 S.Ct.

770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Additionally, the

level of specificity of a Supreme Court rule affects the evaluation of whether its application

was unreasonable. *Id.* "The more general the rule, the more leeway courts have in

reaching outcomes in case-by-case determinations." *Id.* (quoting *Yarborough*, 541 U.S. at 664).

The Supreme Court has also recently held that "§ 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits,' and thus receive deference under § 2254(d). *Harrington*, 131 S.Ct. at 785; *cf. Early v. Packer*, 537 U.S. 3, 8 (2002) (State courts receive deference under § 2254(d) even if they do not cite Supreme Court cases or are unaware of them, "so long as neither the reasoning nor the result of the state-court decision contradicts them."). As a result, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 784-85. However, this presumption "may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 785. When the state opinion does not give the reasons for denial of relief, "a habeas court must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Id.* at 786.

Where state decisions do not receive deference under § 2254(d), federal courts review pure questions of law and mixed questions of law and fact *de novo*, but still presume that pure factual issues determined by the state court are correct. *Hooks v. Ward*, 184 F.3d

1206, 1223 (10th Cir. 1999).

Lastly, "federal habeas relief [is] unavailable when (1) 'a state court [has] declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement,' and (2) 'the state judgment rests on independent and adequate state procedural grounds.'" *Walker v. Martin*, 131 S.Ct. 1120, 1127 (2011) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991)). A petitioner can only overcome this adequate and independent state ground doctrine if he can show cause for failing to comply with the procedural requirement and prejudice from the result. *Id.* (citing *Wainwright v. Sykes*, 433 U.S. 72, 84-85 (1977)). To qualify as an "adequate" procedural ground, a state rule must be "firmly established and regularly followed." *Id.* (quoting *Beard v. Kindler*, 130 S.Ct. 612, 617 (2009)). Even a discretionary state procedural rule, which "[permits] consideration of a federal claim in some cases but not others," can serve as an adequate procedural ground to bar federal habeas review. *Kindler*, 130 S.Ct. at 619. However, procedural default does not bar consideration of a federal claim on habeas review "unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 263 (1989) (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985)).

## ANALYSIS

In his unamended federal habeas application, Duran alleged eight grounds for relief. *Doc. 1.* Subsequent orders of this Court amended Duran's application to include one

16

additional ground and five additional claims within Duran's ground of ineffective assistance of counsel.  *See Docs. 23, 26, 30.*

In total, Duran claims that: (1) he was denied his Sixth Amendment right to a speedy trial; (2) he was deprived of a fair trial due to the absence at trial of DNA test results for the blood found in Duran's truck; (3) he was deprived of a fair trial because of the trial court's exclusion of certain eyewitness testimony; (4) the admission of a custodial statement Duran gave to police before receiving *Miranda* warnings was a non-harmless constitutional error; (5) his rights under the Confrontation Clause were violated by the trial court's ruling that Duran could not cross-examine Finnell regarding her pending and dismissed charges; (6) he was deprived of a fair trial because he and Finnell were treated unequally on the witness stand and when the court admitted the names of two of his prior felony convictions; (7) he was deprived of a fair trial when the prosecutor allegedly committed gross misconduct in his closing argument, which deprived Duran of a fair trial;[8] (8) there was insufficient evidence to support Duran's conviction for first-degree murder; and (9) he received ineffective assistance of counsel on eleven separate grounds.

Although the fifth and sixth claims, as organized above, were not raised as separate grounds in Duran's federal habeas application, I find that both were argued in Duran's

---

[8] This claim includes the fourth and eighth grounds in Duran's unamended application.  I have folded these grounds into one claim because they contain the same allegations.

amended application and are distinct claims.[9]  Furthermore, although Duran did not raise

his Confrontation Clause claim on direct appeal, *see Doc. 10*, Ex. 2 at 46-50, he did raise this

claim in his state habeas petition.  *Doc. 10*, Ex. 5 at 5-8.  Although Duran addressed this

issue there within a claim of ineffective assistance of counsel, I find that he directly raised

a substantive Confrontation Clause issue regarding the trial court's prohibition of certain

cross-examination of Finnell.[10]  As a result, Duran has properly raised and exhausted his

Confrontation Clause claim.

      I will now consider each of Duran's claims in turn.

I.     Speedy Trial

      Duran contends in his first claim that his Sixth Amendment right to a speedy trial

was violated when his trial did not occur until over nineteen months after his grand jury

---

[9] The title of Duran's fifth ground in his amended application reads: "Petitioner
claims he was deprived of a fair trial when the trial court forbade cross-examination of
key witness Mary Finnell regarding her dismissal of drug trafficking and pending
heroin charges, violation of the Sixth Amendment Confrontation Clause; but also
permitted the prosecution to cross-examine Petitioner as to his prior convictions for
voluntary manslaughter and battery on a police officer."  *Doc. 20* at 34.  Duran then
presents arguments for both his Confrontation Clause claim (his fifth claim, as
organized above) and his "unequal treatment" argument (his sixth claim, as organized
above).  *Id.; Doc. 20*, Ex. 1 at 1-12.

[10] Within his ineffective assistance claim, Duran repeatedly referenced the
Confrontation Clause and accompanying case law.  *Doc. 10*, Ex. 5 at 5-8.  At the end of
his claim, Duran stated that "[h]ere as in *Van Arsdall*, a jury might have received a
significantly different impression of Ms. Finnel's [sic] credibility had defense counsel
cross-examined Ms. Finnell regarding her prior felony convictions and had defense
counsel *been allowed* to cross-examine Ms. Finnell regarding her pending charges as a
basis for bias in her testimony."  *Doc. 10*, Ex. 5 at 8 (emphasis added).

indictment.  This claim was adjudicated on the merits during Duran's direct appeal by the NMSC.  *Doc. 10,* Ex. 4 at 4-8.  As a result, I will review this claim under the deferential standard set out in § 2254(d).

Duran was indicted by a grand jury on February 20, 2004, *RP* at 1-3, at which time Duran's right to a speedy trial attached.  *See United States v. Marion,* 404 U.S. 307, 320 (1971). A one-day trial was initially scheduled for September 8, 2004, *RP* at 17, but it was reset to begin on March 28, 2005 and last three days after the parties agreed that a three-day trial was needed and to accommodate the schedule of the court.  *RP* at 17, 22, 85.  In a pretrial conference on January 14, 2005, Duran's counsel expressed concern that he had not yet received ballistics, blood, or DNA test results from the New Mexico crime lab.  *CR-1.*[11]  He emphasized, however, that he did not blame the District Attorney's office for the crime lab's tardiness and the prosecutor promised that he would send the results as soon as he received them himself.  *Id.*

On March 17, 2005, Duran and the State filed stipulated motions to the trial court and the NMSC seeking a six month continuance of the trial.  *RP* at 82-88.  In both motions, the parties stipulated that the crime lab had not yet completed testing, and that "[t]race evidence, particularly DNA evidence, is absolutely critical to the presentation of both the

---

[11]  "CR-1" refers to the cassette tape dated 9-26-05 with this title.  Duran's pretrial conference on January 14, 2005 was only recorded onto this cassette tape and cannot be found on any of the FTR audio recordings on compact discs.

State's and the Defense's cases." *RP* at 82, 85. The petition to the NMSC also provided that "[t]he Defendant is in jail but is not prejudiced by a six (6) month extension." *RP* at 85. These motions were granted and Duran's trial was reset to begin on September 26, 2005. *RP* at 94, 97-98.

On the morning of September 26, 2005, the trial court heard pretrial motions and Duran's counsel moved for dismissal due to a speedy trial violation. *T1 at 8:05*. Duran's counsel argued that he still had not received DNA results for the blood found in Duran's truck, which had been the whole purpose of the six month continuance. *T1 at 8:07-8:10*. He stated that Duran would be prejudiced without the test results because the trial would come down to Duran's word against Finnell's word. *T1 at 8:20*. Counsel argued that Duran was also prejudiced due to the loss of one of his witnesses during the delay before trial. *T1 at 8:12-8:14, 8:17-8:19*. A neighbor across the street from Gallegos' trailer, Kermit Kwasigroch, had given the police a statement after the murder that corroborated Duran's story, but Kwasigroch had died while the trial was pending. *T1 at 8:12-8:14*.

In response, the prosecutor argued that the untested blood could go both ways and that the State was actually prejudiced by the absence of testing, because the blood could have been found to belong to Gallegos. *T1 at 8:27-8:28*. He also stated that Kwasigroch had died before the second trial date of March 28, 2005, so he would not have been available to testify for Duran even if the trial had not been continued by six months. *T1 at 8:43*. In regard to the absence of DNA test results, the prosecutor explained that, due to an overload

20

of work, the New Mexico crime lab had outsourced the materials in Duran's case to a Tennessee crime lab. *T1 at 8:31-8:34.* Although some of the materials were tested there, the New Mexico lab's contract with the Tennessee lab expired before the rest could be tested. *T1 at 8:31-8:34.* By the time a new contract was negotiated, the blood taken from Duran's truck could not be tested in time for the September 26, 2005 trial date. *T1 at 8:31-8:34.*

The prosecutor also drew the trial judge's attention to the fact that, in his petition for a six month continuance, Duran had stipulated that he would not be prejudiced by the extension. *T1 at 8:24-8:25.* This was the dispositive factor for the trial judge, who denied the motion for dismissal. *T1 at 8:57-8:58.* Due to the stipulation, the judge found that Duran was not prejudiced because of the continuance. *T1 at 8:58.*

In his federal habeas petition, Duran contends that his speedy trial right was violated because the State never tested the blood found in his truck and because Kwasigroch died while his trial was pending. *Doc. 1* at 7-11*; Doc. 20* at 6-12. He asserts that because he only agreed to a six month continuance because of the State's "representation" that it would test the blood, his stipulation should be ignored and the resulting delay should be attributed to the State because the blood was not tested before trial. *Doc. 1* at 7.

The Sixth Amendment right to a speedy trial has been incorporated to the states through the Due Process Clause of the Fourteenth Amendment. *Kloper v. North Carolina*, 386 U.S. 213 (1967). Instead of establishing a fixed duration of time between attachment of the right and trial that is "too long," the Supreme Court has instructed courts to conduct

a balancing test and consider the following non-exclusive factors ("*Wingo* factors"): (1) length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 521-23, 530 (1972).

The Court has likened the length of delay to a "triggering mechanism," because there can be no violation "until there is some delay which is presumptively prejudicial." *Id.* at 530-31. If a defendant can show that there was a "presumptively prejudicial delay," which the Court deliberately did not define, courts must then consider "the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim" along with the other factors. *Doggett v. United States*, 505 U.S. 647, 651-52 (1992). How the reason for delay affects the analysis is highly fact-dependent, but the Court has indicated that "[a] more neutral reason such as negligence or overcrowded courts" should still be weighted against the government because it carries the "ultimate responsibility for such circumstances." *Wingo*, 407 U.S. at 531*; see also Doggett*, 505 U.S. at 657. The defendant's assertion of the right, although not necessary to prevail on a speedy trial claim, is entitled to "strong evidentiary weight" and its absence makes it difficult for a defendant to prevail. *Wingo*, 407 U.S. at 531-32.

On the last factor, the Court has explained that prejudice to the defendant should be assessed in light of three interests which the speedy trial right was designed to protect: (i) the prevention of oppressive pretrial incarceration, (ii) minimization of anxiety and concern of the accused, and (iii) limitation of the possibility that the defense is impaired.

*Id.* at 532.  Of these, the third interest is the most serious, and is implicated when witnesses die or disappear during a delay.  *Id.*  The Court has emphasized that the four *Wingo* factors should be considered together, but that none are a necessary or sufficient condition to finding a speedy trial violation.  *Id.* at 533.

In reviewing Duran's speedy trial claim on direct appeal, the NMSC recited the four *Wingo* factors.  *Doc. 10,* Ex. 4 at 5.  After finding that the nineteen month delay before Duran's trial was presumptively prejudicial, the NMSC stated that "as was the case with the district court's analysis and conclusions, the dispositive factor on appeal is whether Defendant was prejudiced by the delay."  *Id.*  On this factor, the court held that Defendant's stipulation that he would not be prejudiced by the six month continuance prevented him from arguing prejudice on appeal.  *Id.* at 6.  In response to Duran's argument that the stipulation should be ignored due to the State's failure to test the blood, the court stated that Duran was improperly "conflat[ing] the prejudice that might have resulted from a delay in bringing the case to trial with any other prejudice that could have resulted from other acts of the State."  *Id.*  The court explained that "in right to speedy trial contests, we are only concerned with the prejudice that results from the delay in bringing the matter to trial."  *Id.*  As a result, "the prejudice resulting from the delay in bringing Defendant's case to trial is different than the prejudice resulting from the State's failure to test the blood found in his vehicle," and the court found none of the former because of Duran's stipulation.  *Id.* at 7.

The NMSC also found that, contrary to Duran's assertions, the State did not "promise" Duran that it would test the blood evidence on his behalf and that Duran could have tested the blood himself pursuant to NMRA, Rule 5-501(B).[12] *Id.* at 7-8. Consequently, the court refused to count the crime lab's failure to test the blood "heavily against the State in our speedy trial analysis." *Id.* at 7. Lastly, the court found that Kwasigroch had died before Duran's March 28, 2005 trial date, which meant that the prejudice suffered by Duran due to the loss of Kwasigroch was not attributable to the six month continuance. *Id.* at 8.

In reviewing the NMSC's decision on this claim, I find that it was not "contrary to" or "an unreasonable application of" clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1). The NMSC correctly listed the *Wingo* factors and extensively analyzed the first and fourth factors. Although it did not discuss Duran's assertion of his speedy trial right, nothing in *Wingo* or other Supreme Court precedent requires courts to make express findings in regard to each *Wingo* factor. Moreover, because Duran did not assert his speedy trial right until the morning of trial and stipulated six months earlier that he was not prejudiced by a delay, despite being incarcerated, the NMSC likely found this factor far less weighty for either side than the issue of prejudice.

_____

[12] The rule provides that "[t]he defendant may examine, photograph or copy any material disclosed pursuant to Paragraph A of this rule." NMRA, Rule 5-501(A)(3) requires that "the state shall disclose or make available to the defendant . . . . any . . . tangible objects . . . which are material to the preparation of the defense or are intended for use by the state as evidence at the trial, or were obtained from or belong to the defendant."

It was not an unreasonable application of Supreme Court precedent for the NMSC to focus on whether Duran suffered prejudice due to the delay of his trial. *Wingo* provides wide latitude to courts when considering the *Wingo* factors, 407 U.S. at 530, 533, and does not bar the NMSC from holding that there was no speedy trial violation after concluding that Duran did not suffer prejudice from the delay before trial.[13]   The NMSC's factual findings are presumed correct, 28 U.S.C. § 2241(e)(1), and Duran has not shown by clear and convincing evidence that Kwasigroch died after his March 28, 2005 trial date.[14] Although the DNA evidence was ultimately not available at trial, I agree with the NMSC that any prejudice caused by its absence is distinct from prejudice caused by delay of trial, to which Duran stipulated there was none.[15]   As a result of the NMSC's findings, the most important interest to be assessed when considering prejudice, impairment of the defense, was entirely absent.[16]   *See Wingo*, 407 U.S. at 532 (discussing the three interests tied to

---

[13] While the Court stated that a single factor could not be a sufficient condition to finding a speedy trial violation, it did not prohibit courts from finding no violation due to analysis of a single *Wingo* factor.  407 U.S. at 533.

[14] Although I cannot consider evidence that was not before the state courts, Duran himself has submitted obituary notices which indicate that Kwasigroch died either on March 4, 2005 or March 6, 2005, both of which were before Duran's prior trial date of March 28, 2005.

[15] Prejudice caused by the absence of DNA evidence is indeed a separate claim, which I will consider below.

[16] There is evidence in the record which suggests that, far from prejudice, Duran hoped to and could have received significant benefit from his six month continuance. *See Wingo*, 407 U.S. at 521 (recognizing that delay and deprivation of the speedy trial

assessments of prejudice).

Duran argues in several places in his briefs, as his counsel did during pretrial motions, that "[e]verybody fails to recognize that the state crime lab's negligence, is the [S]tate's negligence, is also the prosecutor's, they are all representatives of the State of Mexico." *Doc. 20* at 10; *see also T1 at 8:18-8:19* (Duran's counsel arguing that the crime lab's negligence "falls under the umbrella of the State of New Mexico."). As a result, Duran contends that the six-month continuance should be attributed to the State under the "reason for the delay" factor. The NMSC did not address this argument or, as noted, expressly analyze the "reason for the delay" factor. Although it is true that the prosecution also sought a continuance in order to test the blood, even if Duran's "umbrella" argument were correct, it would not mean that the NMSC's decision was an unreasonable application

---

right can sometimes work to the accused's advantage, which complicates the constitutional right to a speedy trial). Duran has argued throughout this case that tests would show that the blood found in his truck was only his own. *See, e.g., T3 at 3:02-3:03.* Although I cannot agree with Duran's counsel's assertion in closing argument that "if this blood is Steve's, then he's innocent," *T4 at 9:48*, I agree with his statements at other times that such test results would have been significant exculpatory evidence. By delaying his March 28, 2005 trial date, Duran increased the chance from zero to something higher that such evidence would be available at trial, which is consistent with his stipulation that "DNA evidence . . . is absolutely critical to the presentation of both the State's and the Defense's cases." *RP* at 85. This and Duran's stipulation of no prejudice indicate that Duran wanted to delay his trial. Presented with similar circumstances, the Supreme Court has stated that "barring extraordinary circumstances, we would be reluctant indeed to rule that a defendant was denied his constitutional right on a record that strongly indicates . . . that the defendant did not want a speedy trial." *Wingo*, 407 U.S. at 536.

of Supreme Court precedent.  Attributing the six-month delay to the State's negligence, which the Supreme Court has said is "weighted more lightly than a deliberate intent to harm the accused's defense," *Doggett,* 505 U.S. at 657, would still have to be considered against the NMSC's finding that the delay did not prejudice Duran.  The Supreme Court test for speedy trial violations is a model example of a broad, general rule, in which courts must be given wide leeway in reaching outcomes in case-by-case determinations.  *See Harrington,* 131 S.Ct. at 786; *Yarborough,* 541 U.S. at 664.  In light of the finding of no prejudice, I do not conclude that the NMSC's balancing of the *Wingo* factors was contrary to or an unreasonable application of Supreme Court precedent.

Accordingly, I recommend dismissal of this claim.

II.     Absence of DNA Evidence

In his second claim, Duran argues that he was prejudiced by the absence at trial of DNA test results for the blood found in his truck.  Duran also contends that in failing to obtain test results before trial, the prosecutor failed to disclose exculpatory evidence, thereby violating *Brady v. Maryland,* 373 U.S. 83 (1963), and lied about his efforts to have the blood tested before trial.  *Doc. 20,* Ex. 3 at 3-7.  The first component of this claim was adjudicated on the merits by the NMSC on direct appeal, *Doc. 10,* Ex. 4 at 8-10, and so I will review it under the deferential standard set out in § 2254(d).[17]  The second component was

---

[17]  In their answer, Respondents argue that Duran has not exhausted any of his claims "involving DNA," because NMSA 1978, § 31-1A-2 creates procedures for post-

not previously presented, but I recommend denying it on the merits. *See* 28 U.S.C. § 2254(b)(2) (permitting federal habeas corpus courts to dismiss unexhausted claims on the merits).

### 1.  Prejudice

As has been discussed, the blood found in Duran's truck was not tested before his trial. The prosecutor and a prosecution witness explained that this was because a contract expired between New Mexico and Tennessee, after New Mexico had outsourced the blood for testing at a Tennessee crime lab. *T1 at 8:31-8:34; T2 at 2:30-2:33.* After the State rested on the third day of trial, Duran's counsel moved for a mistrial out of the presence of the jury. *CR-3.* He argued that the DNA test results were potentially major exculpatory evidence, and that without them the parties were "gambling with the jury." *Id.* The trial judge agreed that the test results had potential value for the defense and that their absence put Duran in a "quandry," but denied the mistrial. *Id.* The trial judge noted that the jury

conviction DNA testing that Duran has not yet utilized. *Doc. 10* at 9. However, this section and procedures only apply to "[a] person convicted of a felony, who claims that DNA evidence will establish his innocence . . . ." NMSA 1978, § 31-1A-2(A). Duran has not made this claim or argued anywhere in his pleadings for actual innocence. Instead, his claims "involving" DNA are that: (1) he suffered a Speedy Trial violation when DNA testing of the blood found in his truck, the reason for a six-month continuance, did not occur; (2) he was deprived of a fair trial when the testing had not occurred before trial; and (3) his counsel was ineffective for not having the blood independently tested before trial. These claims are distinct from the one contemplated by NMSA 1978, § 31-1A-2, and Duran has previously raised each of them. Therefore, I find that these claims have been properly exhausted.

had heard plenty of testimony regarding the blood from both sides that would allow it to rule, albeit in an old-fashioned manner.  *Id.*

On direct appeal, the NMSC held that the trial judge had not abused his discretion in denying a mistrial.  *Doc. 10,* Ex. 4 at 10.  The court stated that the State had no obligation to test evidence that was only potentially exculpatory.  *Id.* at 10.  It also repeated its findings that the State did not promise to test the blood on Duran's behalf, and that Duran could have tested the blood himself.  *Id.*

I find that the NMSC's decision on this claim was not an unreasonable application of clearly established Supreme Court precedent or based on an unreasonable determination of the facts.  28 U.S.C. § 2254(d).  The Supreme Court has held that "police do not have a constitutional duty to perform any particular tests."  *Arizona v. Youngblood*, 488 U.S. 51, 59 (1988).  In so holding, it also explained that, although the State has a duty to disclose material exculpatory evidence, *id.* at 57 (citing *Brady v. Maryland*, 373 U.S. 83 (1963)), the issue is different when the State fails to "preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant."  *Id.*  For this sort of "potentially useful evidence," the Court held that the government's failure to preserve it does not violate due process unless a defendant can show bad faith.  *Id.* at 58.

The NMSC's decision on this claim was consistent with these two components of *Youngblood*.  The blood found in Duran's truck was only potentially exculpatory, and the

29

State had no duty to test it.  Duran has also made no attempt to rebut the NMSC's finding that he could have had the blood independently tested before trial.  Although Duran does dispute the NMSC's finding that the prosecutor never promised that he would test the blood on Duran's behalf, he refers only to remarks where the prosecutor described his own efforts in having the blood tested.  *Doc. 20* at 9.  The prosecutor telling the trial judge on the morning of trial that the crime lab "promised" him the blood would be ready is not the same as the prosecutor promising Duran that he would test the blood.  *Id.*  Furthermore, contrary to an assertion in Duran's brief, *Doc. 20,* Ex. 3 at 4, the State did not stipulate that it would test the blood if Duran agreed to a six month delay.  Duran did not suffer a constitutional violation when both he and the prosecution failed to test potentially exculpatory evidence in time for trial.[18]

      For the foregoing reasons, I recommend dismissal of this claim.

---

[18] Duran argues that by stating that the lack of DNA results put the defense in a "quandry," the trial judge acknowledged that Duran was prejudiced and should have declared a mistrial. *Doc. 20,* Ex. 3 at 5-6.  He further complains that the state took advantage of both sides' inability to scientifically prove the source of the blood by publishing numerous photos of the blood to the jury.  *Id.* at 5.  As the NMSC held, however, it was within the district court's discretion to deny a mistrial and the absence of DNA evidence did not violate any constitutional right.  Additionally, Duran was able to use the absence of DNA evidence at least partially to his advantage.  It was well established at trial that the blood found in Duran's truck was not tested, *T3 at 10:56; T4 at 9:41-9:51, 10:19, 10:21-10:22*, and Duran's counsel was able to get a prosecution witness to admit that all of the blood could have come from a cut on Duran's finger.  *T2 at 3:57.*  The jury also heard that the only blood which was tested, on clothes that Duran said he wore on the night of the murder, was determined to be Duran's blood and excluded as Gallegos' blood.  *T3 at 9:56-9:57, 10:53-10:54.*

2.  Brady *Claim and Prosecutorial Misconduct:*

Within this claim and at other places in his federal habeas petition, Duran argues for the first time that the prosecutor failed to disclose material exculpatory evidence pursuant to *Brady v. Maryland. Id.* at 6-7; *Doc. 20* at 8.  He also argues that the prosecutor committed misconduct by allegedly lying to the district court about his efforts in having the blood tested and by not promptly disclosing the results once he received them. Although this claim is unexhausted, it can be easily dismissed and I will address it on the merits.  28 U.S.C. § 2254(b)(2).

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87.  Exculpatory evidence is material only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

Here, Duran has no valid *Brady* claim because (a) the untested blood was not material, exculpatory evidence, and (b) Duran had full access to it before trial.  The untested blood was only potentially exculpatory, and Duran has not shown that the State suppressed it.  Rather, as noted repeatedly, Duran was fully aware of the blood and could have tested it before trial.  Furthermore, there is nothing in the record that was before the

31

state courts to support Duran's allegations that the prosecutor lied about his efforts in having the blood tested.[19]

Accordingly, I recommend dismissal of these claims.

III.    Exclusion of Evidence

In his third claim, Duran argues that he was deprived of his rights to a fair trial and to present a defense when the trial court excluded out-of-court statements of several defense witnesses who were unavailable at trial.  *Doc. 1* at 13-15; *Doc. 20* at 12-20.  This claim was adjudicated on the merits by the NMSC on direct appeal, *Doc. 10*, Ex. 4 at 10-14, and so I will review it under the deferential standard set out in § 2254(d).

After arriving at Gallegos' home on the night of January 13, 2004, police canvassed the surrounding area for witnesses.  *T1 at 8:12.*  At this time Officer Thomas Rollins spoke with Kwasigroch, who told him that after he heard gunshots, he saw four or five people

---

[19] Duran argues that DNA test results and accompanying correspondence he has submitted reveal that the blood was not sent to the Tennessee crime lab until February 16, 2006, and that the prosecutor withheld the results from Duran until long after his direct appeal was complete.  Even if I could consider this evidence, however, I would still recommend dismissing this claim.  Although the DNA report does indicate that the blood from Duran's truck was not "received" until February 16, 2006, *Doc. 28* at 14, the district court's order for the blood to be tested, which was approved by all parties, states that the blood was "resubmitted" on February 2, 2006 for further testing.  *RP* at 405.  This statement is consistent with the prosecutor's explanation on the morning of trial that some evidence was returned untested due to an expired contract between the New Mexico and Tennessee crime labs.  *T1 at 8:31-8:34.*  Furthermore, a letter indicates that the prosecutor sent the results to Duran's new counsel on May 19, 2010, the same day he received them.  *Doc. 28* at 13.

fighting to open the front door of Gallegos' home and saw two people run away north through an adjacent alleyway. *T1 at 8:12-8:13, 8:40.*  Officer Rollins recorded what Kwasigroch told him in a written report. *RP* at 464-466.  Rollins also spoke with a "young man," who stated that someone else had observed a dark maroon or black truck driving around with guns hanging out the windows soon before the shooting. *RP* at 465.  Rollins wrote that the young man did not identify himself due to fear of retaliation. *RP* at 465.

On January 20, 2004, one week after the murder, Kwasigroch voluntarily came to the police station and provided a sworn, written statement to Officer Yoakum. *Doc. 20*, Ex. 7 at 14.  In the statement, Kwasigroch told substantially the same story that he told Officer Rollins, except that he now said the two people fleeing the scene had run in opposite directions. *Id.*  He also admitted that he was "unsure who they were or where they went," and did not describe any of the other individuals that he observed around the trailer. *Id.*  Neither Kwasigroch nor the "young man" were available at trial.

On the morning of trial, the prosecutor moved *in limine* to exclude any reference to Kwasigroch's statements as inadmissible hearsay. *T1 at 8:43-8:44.*  The prosecutor also moved to have the "young man['s]" statement in Officer Rollins' report excluded. *T1 at 8:50-8:51.*  The trial judge considered Kwasigroch's statements under NMRA, Rule 11-807,[20]

---

[20] The relevant portion of this Rule was codified as NMRA, Rule 11-804(B)(5) at the time of Duran's trial.  The Rule provides, in relevant part:

> A statement not specifically covered by Rule 11-803 NMRA or Rule 11-804 NMRA but having equivalent circumstantial guarantees of

and four factors which the NMSC had instructed courts to consider under the rule when determining whether a statement contains circumstantial guarantees of trustworthiness.[21] *T1 at 9:00-9:04*. After concluding that all four factors weighed against admission of Kwasigroch's written statement,[22] the trial judge held that it was hearsay and too unreliable to be admitted. *T1 at 9:04*. The record appears to indicate that the trial judge also intended to exclude Kwasigroch's statement in Officer Rollins' report, although he mistakenly referred to the report as Officer Yoakum's.[23] *T1 at 9:23*. The trial judge did not make a

---

trustworthiness, is not excluded by the hearsay rule, if the court determines that: (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

[21] These factors include: (1) Ambiguity-the danger that the meaning intended by the declarant will be misinterpreted by the witness and hence the jury; (2) Lack of candor-the danger the declarant will consciously lie; (3) Faulty memory-the danger that the declarant simply forgets key material; and (4) Misperception-the danger that the declarant misjudged, misinterpreted, or misunderstood what he saw. *State v. Coffin*, 991 P.2d 477, 496 (N.M. 1999) (citation omitted).

[22] In considering the *Coffin* factors, the trial judge found that Kwasigroch's statement was ambiguous, that there was no way to bolster his credibility, and that there was a danger of misperception. *T1 at 9:00-9:02*. The trial judge also accepted the prosecutor's statement that Kwasigroch had been admitted to a nursing home before the age of fifty, and noted that Kwasigroch had waited a week before providing his written statement to Officer Yoakum. *T1 at 9:01-9:02*. The trial judge found that both of these facts raised concerns of faulty memory. *T1 at 9:01-9:02*.

[23] After the trial judge had excluded Kwasigroch's written statement, the prosecutor said "I'm just asking for a specific ruling on the Court . . . you are excluding

specific ruling on the statement of the "young man," but Duran's counsel made no subsequent attempt to admit Rollins' report into evidence and appears to have believed that it was entirely excluded.

When reviewing this claim on direct appeal, the NMSC held that the trial judge's exclusion of Kwasigroch's written statement was not an abuse of discretion. *Doc.* 10, Ex. 4 at 13. The NMSC noted that the trial judge had considered the proper factors when analyzing the statement and concluded that they all weighed against admission. *Id.* at 13-14. Duran argued that the statement should have been admitted under the present sense impression exception to the hearsay exclusion, but the NMSC refused to consider that issue because it found that Duran had not argued it before the trial judge. *Id.* at 11-12 (citing *State v. Gomez*, 932 P.2d 1, 6 (N.M. 1997) ("[A]n appellate court will consider only such questions as were raised in the lower court.")). The NMSC also declined to consider whether Officer Rollins' report should have been admitted, because it found that the district court had not ruled on its admissibility. *Id.* at 12 (citing NMRA, Rule 12-216 ("To preserve a question for review it must appear that a ruling or decision by the district court was fairly invoked . . . .")).

I find that the NMSC's decision on this claim was not an unreasonable application

---

any testimony or even reference to testimony from [Kwasigroch] and also these unanimous [sic] tips from these kids . . . ." *T1 at 9:23.* The judge responded that "I'm excluding any testimony that might have been made in a report of Mr. Yoakum's from [Kwasigroch]." *T1 at 9:23.*

of clearly established Supreme Court precedent or based on an unreasonable determination

of the facts.  28 U.S.C. § 2254(d).  The Tenth Circuit has explained that trial courts have

broad discretion regarding the admissibility of testimony, which means that "federal

habeas corpus is limited in reviewing a question regarding the admissibility of evidence.

In order for habeas corpus relief to be granted by a federal court based on a state court

evidentiary ruling, the rulings must render the trial so fundamentally unfair as to

constitute a denial of federal constitutional rights." *Elliott v. Williams*, 248 F.3d 1205, 1214

(10th Cir. 2001) (internal quotation marks and citations omitted).  Although it is true that

"[t]he Supreme Court has made clear that the erroneous exclusion of critical, corroborative

defense evidence may violate both the Fifth Amendment due process right to a fair trial

and the Sixth Amendment right to present a defense," *DePetris v. Kuykendall*, 239 F.3d 1057,

1062 (9th Cir. 2001) (citing *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *Washington v.*

*Texas*, 388 U.S. 14, 18-19 (1967)), there was no erroneous exclusion of evidence in this case.

Instead, the trial judge and NMSC considered the admission of Kwasigroch's written

hearsay statement under relevant New Mexico law, and it was within their discretion to

conclude that the statement was too unreliable to be admitted.[24]

---

[24] Duran argues that because the record shows that the trial judge meant to also exclude Kwasigroch's statement in Officer Rollins' report, the judge made at least a partial ruling regarding the report and the NMSC should not have refused to consider the issue on procedural grounds.  *Doc. 20* at 16-17.  While I agree with Duran on this point, the trial judge's ruling on Kwasigroch's statement in the report was nonetheless proper for the same reasons that the judge found his written statement to be

With respect to the remaining "exclusion of evidence" claims – (a) that the exclusion of evidence violated his Fifth Amendment right to a fair trial and Sixth Amendment right to present a defense, and (b) that the evidence should have been admitted as a present sense impression – the NMSC refused to consider these arguments because they had not been raised before the district court. *Id.* at 14 (citing *Gomez*, 932 P.2d at 6; NMRA, Rule 12-216). "Claims that are defaulted in state court on adequate and independent state procedural grounds will not be considered by a habeas court, unless petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice." *Smith v. Workman*, 550 F.3d 1258, 1274 (10th Cir. 2008); *see also Gutierrez v. Moriarty*, 922 F.2d 1464, 1473-74 (10th Cir. 1991) (Anderson, J., concurring in part and dissenting in part) (citing numerous cases for the proposition that "[m]any New Mexico cases, in a variety of different contexts, recite and apply the general rule that '[o]n appeal, a reviewing court will not consider issues not raised in the trial court.'"). Not only is the NMSC's factual finding that these arguments were not presented before the trial court presumed to be correct, I also could not find when Duran presented these arguments in my own review of the record. Duran has not argued or established that his case falls into an exception to the "independent and adequate basis" rule.

---

inadmissible hearsay. The judge did not formally rule on the statement of the "young man" in Officer Rollins' report, but its exclusion would certainly not have been erroneous.

Accordingly, I recommend denial of this claim.

IV.    Admission of Statements Given Before *Miranda* Warnings

In his fourth claim, Duran argues that he suffered a non-harmless violation of his Fifth Amendment rights when a prosecution witness testified to statements made by Duran before he was given *Miranda* warnings.  *Doc. 1* at 18-19; *Doc. 20* at 20-26.  This claim was adjudicated on the merits by the NMSC on direct appeal, *Doc. 10*, Ex. 4 at 14-23, and so I will review it under the deferential standard set out in § 2254(d).

As noted earlier, while incarcerated at a detention center outside Albuquerque, Duran answered questions from Officer David Yoakum when the officer came to transport him to Clovis.  At trial, Yoakum testified that he noticed at this time that Duran was clean-shaven and had dyed his hair orange-red.  *T3 at 10:22*.  He then testified: "I asked him, 'I see you dyed your hair.'  He stated, 'yeah.'  As to why he had dyed it, he said he was running.  I said, 'from who?'  He said 'you guys,' implying the cops."  *T3 at 10:23*.  Only after this exchange did Yoakum issue *Miranda* warnings.  *T3 at 10:23*.

Duran's counsel immediately moved for a mistrial, or in the alternative to strike Yoakum's testimony and for a curative instruction.  *T1 at 10:24-10:25*.  These motions were denied, but the trial judge explained that he would not provide a curative instruction because he worried that doing so would draw more attention to Duran's statements and further prejudice him.  *T1 at 10:27, 10:29*.

When reviewing this claim on direct appeal, the NMSC found that Duran was both

38

in custody and being interrogated when he made the statements at issue.  *Doc. 10*, Ex. 4 at

17-18.  As a result, the court held that admitting Duran's pre-warning statements was a

constitutional error in violation of his Fifth Amendment rights.  *Id.* at 17 (citing *Miranda v.*

*Arizona*, 384 U.S. 436, 478-79 (1966)).  However, after conducting additional analysis, the

court concluded that the error was harmless beyond a reasonable doubt and therefore did

not warrant reversal and a new trial.  *Id.* at 23.

The NMSC stated that the test for determining whether a constitutional error is

harmless is "whether there is a reasonable possibility that the evidence complained of

might have contributed to the conviction."  *Id.* at 18 (quoting *Chapman v. California*, 386 U.S.

18, 23 (1967)).  The court also noted that it could uphold the jury verdict "*only* when the

State has established beyond a reasonable doubt that the jury verdict was not tainted by

the constitutional error."  *Id.* at 19 (emphasis in original) (citation omitted).  The court

stated that this inquiry "is not whether, in a trial that occurred without the error, a guilty

verdict would surely have been rendered, but whether the guilty verdict actually rendered

in *this* trial was surely unattributable to the error."  *Id.* (emphasis in original) (quoting

*Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993)).  The NMSC explained that, in making this

determination, it must consider at least five factors:

> (1) the importance of the witness's testimony in the prosecution's case, (2)
> whether the testimony was cumulative, (3) the presence or absence of
> evidence corroborating or contradicting the testimony of the witness on
> material points, (4) the extent of cross-examination otherwise permitted, and,
> of course, (5) the overall strength of the prosecution's case.

*Id.* at 19 (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

The NMSC found that the first *Van Arsdall* factor weighed in Duran's favor because Officer Yoakum's testimony recounted statements made by Duran himself, meaning the jury could have given them considerable weight. *Id.* at 22. On the second factor, the NMSC found that all of Yoakum's testimony was cumulative except for the portion in which Duran said he was fleeing specifically from the police. *Id.* at 21-22. This was because another witness, Officer Paul Pacheco, testified that Duran had dyed his hair orange and lacked facial hair when Pacheco helped arrest him, and because Duran himself testified that he dyed his hair and fled Clovis because he was afraid of the real murderers. *Id.* at 21.

On the third factor, the NMSC found that Duran "attempted to explain away [his statement about fleeing the cops] by stating that he was fleeing the men who actually killed [Gallegos]," and that this testimony also "allowed the jury to infer that he was fleeing the authorities because he was afraid that he might have to testify against the real perpetrators in court." *Doc. 10*, Ex. 4 at 22. The court found that this testimony "[suggested] that [Duran] seized the opportunity to refute all evidence of flight," and it concluded that the third factor therefore weighed in the State's favor. *Id.* The NMSC expressly gave no weight to the fourth factor because, although Duran had the chance to cross-examine Officer Yoakum regarding the improperly admitted statements, it found that he "likely did not do so in order to yet again avoid drawing the jury's attention to them." *Id.*

On the fifth factor, the NMSC found that "[a]lthough the State's case was mostly, if

not entirely, based on circumstantial evidence," it was "more than sufficient to establish his guilt beyond a reasonable doubt." *Id.* at 23. The court stated that "the jury was forced to choose between two versions of events: [Duran's] and [Finnell's]," and that even without Yoakum's testimony there was "substantial evidence to corroborate [Finnell's] testimony that [Duran] was the only person at the scene with a gun the night of Ricky's murder." *Id.* As a result, the NMSC concluded that the State's case was "overall a strong one" and weighed the fifth factor in the State's favor. *Id.* at 22-23. Without additional discussion, the court held that the constitutional error was harmless. *Id.* at 23.

I find that the NMSC's decision on this claim was not an unreasonable application of clearly established Supreme Court precedent or based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d). Although the NMSC incorrectly stated that the "test" for determining whether a constitutional violation is harmless is "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction," the court subsequently stated that the State must establish beyond a reasonable doubt that the violation did not taint the jury verdict. *Doc. 10*, Ex. 4 at 18-19. This second statement is a correct recitation of the harmless error standard for constitutional error, created by the Supreme Court in *Chapman v. California*.[25] The NMSC then correctly listed the factors

---

[25] The Court in *Chapman* stated that "[t]here is little, if any, difference between [the statement] 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction' and requiring the beneficiary of a constitutional error to prove a beyond reasonable doubt that the error complained of

established by the Supreme Court for determining whether a constitutional error is harmless, *Van Arsdall*, 475 U.S. at 684, and applied them to Duran's case.

Duran argues that the NMSC unreasonably applied the third *Van Arsdall* factor to the facts of his case when it surmised that his testimony "allowed the jury to infer that [Duran] was fleeing the authorities because he was afraid that he might have to testify against the real perpetrators." *Doc. 10*, Ex. 4 at 22. Duran argues that he testified only that he fled because he was afraid of being killed by the real perpetrators, and that the NMSC's supposition as to what the jury could have inferred was an impermissible "[revisiting of] the jury room." *Doc. 20* at 23-24. Duran contends that, without this component of the NMSC's analysis, the third *Van Arsdall* should have weighed in Duran's favor instead of against him. *Id.* at 24.

Even if I were to agree with Duran on this argument, I could not conclude that the NMSC's view regarding the third *Van Arsdall* factor was unreasonable or that the *Van Arsdall* factors as a whole were unreasonably applied to the facts of his case. *Workman*, 560 F.3d at 1170. As noted, the NMSC made findings with regard to each factor and did not weigh the third factor against Duran solely because of what it believed the jury could infer. Furthermore, because the Supreme Court's rule for harmless error analysis is general and

---

did not contribute to the verdict obtained." 386 U.S. at 24. However, the Court's actual holding was "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id.*

involves the weighing of many factors, on habeas review courts must be given wide leeway in reaching outcomes in case-by-case determinations. *See Harrington*, 131 S.Ct. at 786; *Yarborough*, 541 U.S. at 664. The NMSC's thorough application and analysis of the *Van Arsdall* factors was not unreasonable.

Duran also asserts that the NMSC's conclusion violates the NMSC's statement in another case that "constitutional error cannot be deemed harmless simply because there is overwhelming evidence of the defendant's guilt," *State v. Gutierrez*, 162 P.3d 156, 163 (N.M. 2007), but this argument fails for at least two reasons. First, the NMSC recognized this principle in Duran's case, *Doc. 10*, Ex. 4 at 19-20, and noted repeatedly that the strength of the evidence was not a dispositive factor in its holding. *Id.* at 22-23. Second, the Supreme Court has never held, unlike the New Mexico Supreme Court, that constitutional error cannot be found harmless solely because of overwhelming evidence of guilt.

For the foregoing reasons, I recommend dismissal of this claim.

V.     Limitation of Cross Examination

In his fifth claim, Duran argues that his Sixth Amendment rights were violated when the trial court ruled that he could not cross-examine Mary Finnell regarding any charges brought against her by the State that had not resulted in a conviction. *Doc. 1*, Ex. 1 at 1-2, 9-10; *Doc. 20*, Ex. 1 at 2-12.

As discussed earlier, although Duran did not bring this claim on direct appeal, he did raise it in his state habeas petition. *Doc. 10*, Ex. 5 at 5-8. While this petition was

43

summarily denied by the New Mexico district court and the NMSC, the Supreme Court has recently held that summary denials are presumed to be adjudications "on the merits" under § 2254(d) unless "there is a reason to think some other explanation for the state court's decision is more likely." *Harrington*, 131 S.Ct. at 785. Although the language used by the district court arguably indicated that it did not dismiss Duran's state habeas petition on the merits,[26] *Doc. 10*, Ex. 6 at 1-2, the NMSC denied Duran's petition in a one-sentence summary order.[27] *Doc. 10*, Ex. 7 at 54. This was the same manner in which the prisoner's state habeas petition was denied in *Harrington*, and, like in *Harrington,* Duran cannot overcome the presumption that the denial was on the merits. *See id.* at 783-85 (describing the petitioner's efforts to overcome the presumption in the wake of the court's summary denial as "pure speculation"). As a result, I must review this claim under the deferential

---

[26] Before concluding that Duran was not entitled to relief as a matter of law, the district court stated that:

> The issues presented by the Petition for a Writ of Habeas Corpus by Petitioner were substantially those issues presented to the New Mexico Supreme Court. The Supreme Court very adequately reviewed the record itself and the briefs of the parties . . . . The Supreme Court wrote on those issues presented by the Defendant in the Petition for Writ of Habeas Corpus filed by the Petitioner, Steve Robert Duran. This Court finds that there are no new issues of import which have not been addressed in the Supreme Court opinion.

*Doc. 10*, Ex. 6 at 1-2. However, Duran did raise three new claims of ineffective assistance of counsel in his state habeas petition that he had not argued on direct appeal. *See Doc. 10*, Ex. 5 at 4-5, 8-9.

[27] After introducing Duran's petition, the NMSC stated only that "NOW, THEREFORE, IT IS ORDERED that the Petition for Writ of Certiorari is denied." *Doc. 10*, Ex. 7 at 54.

standard set out in § 2254(d).

On the morning of trial, Duran's counsel indicated that he wanted to cross-examine Finnell about charges which were pending against her. *T1 at 8:20, 9:11-14*. Specifically, defense counsel wanted to cross-examine her regarding a possession of heroin charge and a heroin trafficking charge which were brought later in 2004, after Gallegos' murder. *T1 at 9:11-14*. Duran's counsel stated that, according to the record, Finnell's pending charges had dispositions "pending the outcome" of Duran's trial. *T1 at 8:20*. He told the trial judge "I don't know what that means, but I got a bad feeling that that means that it depends on what she does at this case."[28] *T1 at 8:20*. The prosecutor, Matthew Chandler, told the court that there had been no deal about those charges in exchange for Finnell's testimony. *T1 at 8:52-8:53*. Because no deal existed and because pending charges are not convictions, Chandler argued that defense counsel should be prohibited from using them in the cross-examination of Finnell. *T1 at 9:08-11, 9:15-16* (citing NMRA, Rule 11-608(b); *State v. Herrera*, 694 P.2d 510 (N.M. 1985)). The trial judge agreed with Chandler and held that Duran could not inquire into charges brought against Finnell which had not yet resulted in a conviction. *T1 at 9:18*. At trial, Duran's counsel did not question Finnell regarding either of her

---

[28] Duran has submitted materials referring to other charges (and the resolution thereof) which may have been pending against Finell, but were never discussed before the trial court or in any state habeas proceeding. *Doc. 20*, Ex. 8 at 6-14. As these were not part of the record that was before the state courts, they must have "no bearing" on my review. *See Cullen*, 131 S. Ct. at 1400.

pending charges.

The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." The Supreme Court has found that "[t]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination," and that "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 316-17 (1974) (citations omitted). Although the Court has cautioned that "trial judges retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant," *Van Arsdall*, 475 U.S. at 679, it has found Sixth Amendment violations due to limitations on cross-examination on at least two occasions.

In *Davis*, the trial court granted a protective order that prevented the defendant from referring to the juvenile record of a "crucial" witness against him, Green, during cross-examination. 415 U.S. at 311. At the time of the events that he testified to, Green was on probation from a juvenile adjudication. *Id.* at 310-11. The defendant had sought to show that Green's testimony may have been colored by fear of losing his probation, or that the police may have pressured him to make certain identifications. *Id.* at 311. The Court held that the prohibition of such cross-examination violated the defendant's rights under the

Confrontation Clause, because "[t]he accuracy and truthfulness of Green's testimony were key elements in the State's case against petitioner." *Id.* at 317. In reversing the defendant's convictions, the Court stated that "the claim of bias which the defense sought to develop" should have been admitted so the jury could have considered the defense's theory. *Id.* at 317-18.

In *Van Ardsall*, the Court held again that a trial court's prohibition of cross-examination had violated a defendant's rights under the Confrontation Clause. 475 U.S. at 679. Defense counsel had sought to impeach a prosecution witness, Fleetwood, by asking about the dismissal of a drunkenness charge brought against him after he agreed to speak with the prosecutor about the case at issue. *Id.* at 676. Fleetwood admitted that the charge had been dropped in exchange for his testimony, but denied that the agreement affected his testimony. *Id.* The trial court barred any cross-examination about that agreement, citing a state rule of evidence, and also barred cross-examination regarding police questioning Fleetwood had undergone in connection with an unrelated homicide. *Id.*

> The Supreme Court held that
>
> [A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness."

*Id.* at 680. The Court found that the trial court's rulings violated this standard, because they

"prohibited *all* inquiry into the possibility that Fleetwood would be biased as a result of the State's dismissal of his pending public drunkenness charge." *Id.* at 679 (emphasis in original). In so doing, the court "[cut] off all questioning about an event that the State conceded had taken place and that a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony." *Id.* However, the Court held that Confrontation Clause violations are subject to harmless-error analysis and remanded that determination to a lower court. *Id.* at 684.

In a more recent state case, the New Mexico Court of Appeals (NMCA) found a Confrontation Clause violation after applying these principles. *See State v. Martinez,* 927 P.2d 31, 35-38 (N.M. Ct. App. 1996). In *Martinez*, charges against a prosecution witness, Mullins, had been dismissed without prejudice due to a venue problem. *Id.* at 35. At the time of trial, the charges had not yet been re-filed and Mullins stated during a pretrial interview that she not made a deal in regard to them. *Id.* The trial court ruled that the defendant could not cross-examine witnesses about Mullins' arrest or the charges that had been dismissed. *Id.* The NMCA held that the defendant

> [S]hould have been permitted to inquire into any possibility that Mullins was biased or motivated to fabricate testimony, even in the absence of evidence that a deal had been made or could have been made exchanging her testimony for leniency. A jury, when judging a witness's credibility, should be able to take into consideration whether a witness *hoped* to curry favor by cooperating with the prosecution . . . . When a witness faces prosecution, even on an unrelated matter, bias may result from the treatment that witness hopes to receive.

*Id.* at 36 (emphasis on original).

In reaching its holding, the NMCA distinguished a Tenth Circuit case, *United States v. Ellzey*, where the court held that no Confrontation Clause violation had occurred after finding the defendant had not shown a "direct link between the witness's testimony and potential reward or retribution by the charging prosecution . . . ."  *Id.* (citing *Ellzey*, 936 F.2d 492, 497 (10th Cir. 1991)).  The pending charges against the witness in *Ellzey* had been in state court, and the Tenth Circuit found no evidence that the federal prosecutors in the case at issue had any control or power over the state charges.  936 F.2d at 496.  As a result, the Tenth Circuit concluded that the witness could not have held any bias stemming from charges in another jurisdiction, under separate prosecuting authority.  *Id.* at 496-97.  In *Martinez*, however, the NMCA noted that the charges filed against Mullins and the case at issue were both in state court, creating the possibility of bias.  927 P.2d at 36.

The NMSC has affirmed and elaborated on the analysis in *Martinez* in a subsequent case.  *State v. Gonzales*, 989 P.2d 419, 424-25 (N.M. 1999).  In *Gonzales*, the defendant was prevented from cross-examining a prosecution witness about a prior plea agreement and conviction.  *Id.* at 421.  The NMSC cited *Martinez* and stated that its "determinative factor" had been that "[a] jury . . . should be able to take into consideration whether a witness *hoped* to curry favor by cooperating with the prosecution."  *Id.* at 425 (*quoting* 927 P.2d at 36).  Here, however, the NMSC found that "a past and final dealing with the State [was] the only ground for a potentially improper motive . . . ."  *Id.*  The circumstances were thus very different than in *Martinez*, "where there was a reasonable expectation of future and

continuing dealing with the State as an adverse party." *Id.* Consequently, the NMSC found that there was no reasonable inference that the witness hoped to curry favor, and no Confrontation Clause violation. *Id.*

Applying the analysis of these cases, the only reasonable conclusion the NMSC could have reached would have been to find that the trial judge's prohibition of cross-examination regarding Mary Finnell's pending charges was a constitutional error in violation of Duran's rights under the Confrontation Clause. Like in *Davis*, Mary Finnell was a crucial witness for the prosecution. In its opinion on direct appeal, the NMSC even stated that "with only circumstantial evidence of [Duran's] guilt, the jury's task was to determine whether [Duran's] or [Finnell's] version of what occurred was correct." *Doc. 10,* Ex. 4 at 29. Therefore, the accuracy and truthfulness of Finnell's testimony were key elements in the case against Duran, yet the trial judge barred all inquiry into charges brought against Finnell that had not yet resulted in convictions.

It is indisputable that the pending charges were something that a "jury might reasonably have found furnished the witness a motive for favoring the prosecution." *Van Arsdall*, 475 U.S. at 679. The fact that the trial judge and Duran's counsel accepted the prosecutor's promise that he had not spoken with Finnell about the charges did not eliminate the possibility that they created prototypical bias or Duran's right to have the jury made aware of them. Simply put, it would have been reasonable for the jury to infer that Finnell nonetheless "hoped to curry favor by cooperating with the prosecution." *Martinez,*

927 P.2d at 36 (emphasis omitted).

Certainly, the procedural posture and location of Finnell's charges did not remove a reasonable inference that Finnell hoped to curry favor with her testimony. Unlike in *Ellzey*, the charges against Finnell were brought in state court, where Duran's trial also occurred, and even in the same district. *See RP* at 1; *Doc. 20*, Ex. 8 at 6-7, 11-12. Unlike in *Gonzales*, the charges were still pending and not at all a "past and final dealing with the State." 989 P.2d at 425. Chandler even admitted to the trial judge before trial that, although Finnell had not yet been convicted of heroin use, "she might be." *T1 at 9:16.* This statement by itself establishes that Finnell had a "reasonable expectation of future and continuing dealing with the State as an adverse party." *Gonzales*, 989 P.2d at 425. The same officials that called Finnell as the principal witness against Duran had the power to subject her to future prosecution, and the jury should have been able to consider whether such circumstances created bias. The trial judge's decision to the contrary was a constitutional error, regardless of any grounding the decision may have had in state law.[29] *See Van Arsdall*, 475 U.S. at 676, 679 (finding a constitutional violation despite the trial court's reliance on a state rule of evidence).

---

[29] The trial judge did not state the particular legal authority on which he prohibited cross-examination into Finnell's pending charges. *T1 at 9:19* (stating that he would be "clearly out of bounds" if he allowed Finnell to be asked "haven't you been charged with something or another."). The prosecutor's arguments were based on New Mexico's versions of Fed. R. Evid. 403 and 404(b). *T1 at 9:08-11, 9:15-16.*

Although I conclude that it would have been unreasonable for the NMSC to find that the trial judge's ruling was not a constitutional error, I must consider whether the NMSC could reasonably have concluded that the error was nonetheless harmless beyond a reasonable doubt. *See Harrington*, 131 S.Ct. at 786. The Supreme Court has held that "the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to *Chapman* harmless-error analysis." *Id.* at 684. In this situation, "the correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Id.* In making this determination, the NMSC had to consider (1) the importance of Finnell's testimony in the prosecution's case, (2) whether her testimony was cumulative, (3) the presence or absence of evidence corroborating or contradicting Finnell's testimony on material points, (4) the extent of cross-examination otherwise permitted, and (5) the overall strength of the prosecution's case. *Id.* Because the NMSC did not provide reasons for its denial of its claim, I will analyze each of these factors and determine if, considering them together, the NMSC could have reasonably concluded that the restriction of Duran's cross-examination of Finnell was harmless beyond a reasonable doubt.

I find that the first two factors should have weighed in Duran's favor, for the same reasons. No other prosecution witness was present at 1017 Sunrise before the murder or personally knew Duran. As a result, much of Finnell's testimony was not cumulative and

was important in the case against Duran.  Among the noncumulative testimony of Finnell was that: (i) while arguing with Gallegos about money immediately before he was murdered, Duran drew a gun and threatened to shoot Gallegos, *T1 at 3:50-3:52*; (ii) there was a "click" sound from inside Gallegos' trailer, where only he and Duran were present, shortly before Gallegos was shot, *T1 at 3:53-3:54*; (iii) Gallegos had a habit of keeping large amounts of money in his pants pocket, which Duran had observed shortly before the murder, *T1 at 3:26-3:27, 4:12*; and (iv) thirteen days before the murder, Duran visited Gallegos' home with a gun and the two had fired it into the air together at the turn of the year.  *T1 at 3:33-3:34.*

However, there was other evidence presented that corroborated many of the material points of Finnell's testimony.  Rosa Lucero, Finnell's mother who lived across the street from Gallegos' home, testified that Finnell had run into her home crying and yelling immediately before shots were fired and asked Lucero to call 911.  *T2 at 8:52-8:53.*  She also testified that she observed only one man leave Gallegos' home after the shots, and did not see anyone else or other vehicles around the home.  *T2 at 8:55-8:57.*  Although Lucero admitted that she could not identify or describe the man she saw leaving, she testified that Finnell had told her "Stevie had taken out a pistol."  *T2 at 8:52-8:53.*  Robert Judd also testified that he saw no other vehicles or people around Gallegos' home after the shooting, and he identified Duran in court as the sole man he observed leaving the home.  *T1 at 5:39-5:43, 6:00.*

The State also presented circumstantial evidence that corroborated other material points in Finnell's testimony. Although no one else testified that Duran owned a gun, which Duran denied, *T3 at 2:55, 3:09, 3:47*, police found a nine-millimeter bullet at his residence, which was the same caliber as the bullets that killed Gallegos. *T3 at 9:36-9:38*. The jury was therefore able to infer that Duran possessed a gun, and the same one used to kill Gallegos, due to more than just Finnell's testimony that she had observed Duran with a gun. An Allsups clerk also testified that less than two hours before he was murdered, Gallegos visited the store and had a large roll of bills in his right pocket. *T2 at 11:14-11:16*. This, combined with Duran's own testimony that he had visited Gallegos approximately four hours before the murder, *T3 at 2:49-2:50*, allowed to jury to find, independent of Finnell's testimony, that Duran knew Gallegos was carrying large amounts of money on the night he was murdered. Additionally, Duran himself admitted that he had visited Gallegos immediately before he was murdered and argued about money. *T3 at 2:51-2:52*.

Of course, as explained in *Martinez,* the importance of being able to cross-examine Finnell about her pending charges was to allow the jury to consider that Finnell's testimony was impacted by some hope of favorable treatment from the prosecution. Given this basis, the evidence that most dramatically undermines the impact of this potential bias comes from Finnell's statements immediately after the shooting. Officer Gore, who responded to the scene, testified that Finnell's account of the events was consistent from the beginning. *T2 at 10:10-10:11*. Moreover, the jury heard the audio tape that was recorded from the

54

dashboard of the Officer Gore's vehicle after he arrived at the crime scene. *T2 at 10:41-10:49.* On the tape, Finnell can be heard telling officers that Duran had come over after dinner and that only she, Duran and Gallegos were present at 1017 Sunrise before the murder. *T2 at 10:41-10:43.* Finnell can also be heard sobbing, screaming, and describing Duran's vehicle for police. *T2 at 10:45-10:46.*

Nothing in the record even suggests that, at the moment Finnell gave her statement to Officer Gore, she could have believed that accusing Duran would likely gain her favorable treatment from the prosecutor. In fact, the "pending charges" on which Duran's counsel sought to cross-examine Finnell were not brought against Finnell until after she gave her statement to Gore. *T1 at 9:11-14* (statement was given on January 13, 2004, and charges were not brought against Finnell until later in 2004).[30] Moreover, even if the charges had been pending at that moment, her emotional state and the context of her statement to Officer Gore makes it extremely hard to believe that the statement made that day had been tainted by a plan to gain favorable treatment from a prosecutor down the road. *See* Fed. R. Evid. 801(d)(1)(B) (permitting admission of prior consistent statements). Given that her trial testimony was consistent on all material points with her statement to

---

[30] In his federal case, Duran has presented documents which reflect charges which may have been pending against Finnell at the time of trial beyond the 2004 possession of heroin and trafficking heroin charges. *Doc. 20*, Ex. 8 at 6-20. However, the evidence of these additional "pending charges" was never presented to the state court and does not appear in the state court record. Therefore, this Court may not consider them in its habeas review. *See Cullen*, 131 S. Ct. at 1400.

Officer Gore, the argument that her testimony was biased by her desire to mitigate her own legal problems would hold little sway.  For all of these reasons, the third factor should have weighed heavily in the State's favor.

The fourth factor also should have weighed in the State's favor, although to a lesser degree.  The trial judge did not restrict the cross-examination in any other way and Duran's counsel was able to elicit several favorable admissions from Finnell.  Among other things, Finnell admitted that she and Gallegos used heroin once or twice a day, that she did not actually see who shot Gallegos, that she had not told the police or grand jury about when Duran saw Gallegos counting his money, and that she told the grand jury that Duran had visited with a gun on July 4, 2003 instead of December 31, 2003.  *T1 at 4:08, 4:12-4:17, 4:25.* This last admission was particularly effective in challenging Finnell's credibility because the jury learned that Duran had been incarcerated on July 4, 2003, making a visit to Gallegos' home impossible.  *T1 at 4:15-4:17.*  The trial judge also permitted Duran to impeach Finnell on the fact that she had a prior felony conviction, *T1 at 9:19*, which Duran's counsel did but chose not to elicit the name of the felony.[31]  *T1 at 4:10.*  While there was no other cross-examination available to create the inference that Finnell hoped to curry favor by cooperating with the prosecution, as described above, the "pending charges" bias angle was not particularly potent given her statement at the scene.  Defense counsel's cross-

---

[31] Duran's complaints regarding this issue are discussed as part of one of Duran's claims of ineffective assistance of counsel.

examination was able to hit several more significant points and, therefore, the fourth factor weighs in favor of the State.

Finally, the fifth factor should also have weighed in the State's favor.  Unlike in *Martinez* where the cross-examination of "the State's only witness" on one count was improperly restricted, in Duran's trial the jury heard considerable evidence beyond Finnell's testimony linking Duran to Gallegos' murder.  *Cf. Martinez*, 927 P.2d at 34, 38. Two other witnesses, Lucero and Judd, testified that only one man[32] left Gallegos' home after shots were fired and that no other cars were parked outside.  *T1 at 5:39-43; T2 at 8:55-57*.  Duran himself admitted that no other cars were parked outside or on the street.  *T3 at 3:37*.  The same caliber of bullet used to kill Gallegos was found at Duran's residence, and Duran was captured two weeks after the murder, hundreds of miles away, with an altered appearance.   As detailed above, several other witnesses[33] testified to considerable circumstantial evidence that supported Finnell's story or otherwise strongly implicated Duran in Gallegos' murder.  This evidence included Finnell's audiotaped statement from the night of the murder detailed above.

In my review of the trial record and analysis of the *Van Arsdall* factors, I find that it would have been reasonable for the NMSC to conclude that the constitutional error

---

[32] Judd even identified the man as Duran.  *T1 at 5:39-43*.

[33] These were Robert Judd, Rosa Lucero, Officer Gore, Officer Pacheco, Officer Kirk Roberts, and Officer Yoakum.

stemming from the restriction of the cross-examination of Finnell was harmless beyond a reasonable doubt.  Although Finnell's testimony was important and some portions were non-cumulative, many material portions were corroborated by other evidence and the prosecutor's case was strong overall.  I am particularly persuaded that any doubts the jury may have formed regarding Finnell's version of events, had it heard of her pending charges, would have been eviscerated by the audio tape of Finnell from the night of Gallegos' murder and Officer Gore's accompanying corroborative testimony.

Accordingly, I recommend that this claim be denied.

VI.    Admission of Felony Convictions and Unequal Treatment of Witnesses

In his sixth claim, Duran argues that he was deprived of a fair trial when he and Mary Finnell were "treated unequally" on the stand and when the trial court admitted the names of two of Duran's prior felony convictions.  *Doc. 1*, Ex. 1 at 1-11; *Doc. 20* at 34, Ex. 1 at 1-2.  This claim was adjudicated on the merits by the NMSC on direct appeal, *Doc.* 10, Ex. 4 at 27-31, and so I will review it under the deferential standard set out in § 2254(d).

On the morning of trial, the trial judge ruled over the prosecutor's objection that Mary Finnell could be impeached with the fact that she had a prior felony conviction.  *T1 at 9:19.*  The trial judge also approved a stipulated document prepared by the prosecutor and Duran's counsel, which indicated that Duran had been convicted of a past third-degree felony but did not reveal the name of the felony.  *T1 at 9:05-9:06.*  During the direct examination of Officer Yoakum at trial, the court  admitted two certified documents which

58

stated that Duran had a third-degree felony conviction and a fourth-degree felony conviction in the last ten years. *T1 at 10:48-10:49.* Yoakum did not testify to the names of the convictions, and Duran's counsel did not object to the documents' admission. *T1 at 10:48-10:49.*

However, Duran's counsel did object when, outside the presence of the jury, the prosecutor later moved to be able to elicit the names and times of Duran's two felony convictions. *CR-3.* Duran's counsel argued that admitting the names would be highly prejudicial, especially because one of the convictions was for voluntary manslaughter and involved the death of Duran's own father. *CR-3.* The trial court nonetheless ruled that Duran could be impeached with the name, degree, and time of his convictions on cross-examination, but not on the details of the crimes. *CR-3.*

During the cross-examination of Finnell, Duran's counsel elicited that she had a prior felony conviction but did not ask her for its name or any additional questions. *T1 at 4:10.* During the cross-examination of Duran, the prosecutor elicited that he had been convicted of voluntary manslaughter, a third-degree felony, and battery on a police officer, a fourth-degree felony. *T3 at 3:13-3:14.* The prosecutor did not directly ask Duran about the nature of his crimes, but was able to goad Duran into testifying to some of their details. When the prosecutor asked "are those crooked police officers too?" Duran replied "the guy

grabbed me and I socked him . . . I defended myself, yes."[34]  *T3 at 3:14.*  Duran also

introduced the fact that the victim of his voluntary manslaughter conviction was his father.

*T3 at 3:14.*  Later, Duran testified to further details of this conviction after the following

exchange:

> Q:    We know you've done it before.
> A:    Done it before?  Done what before?
> Q:    You've been convicted of voluntary manslaughter.
> A:    Do you want me to tell you about that, what happened with the facts of that?
>        That it was an accident?
> Q:    It's up to you.

*T1 at 3:20.*  Duran then recounted the details of the conviction, in which he accidentally

stabbed his father, and explained that he used drugs ever since to ease the pain from his

role in his father's death.  *T3 at 3:20-3:22.*  Duran's counsel did not object during this

sequence.

When reviewing this claim on direct appeal, the NMSC held that the trial court did

not abuse its discretion in admitting the name of Duran's conviction for voluntary

manslaughter.  *Doc. 10*, Ex. 4 at 30.  The NMSC considered the admission under a state

court decision and rule of evidence, and noted that the similarity of the offense to Duran's

present charge of first-degree murder was only one factor among six that the trial court had

to consider.  *Id.* at 28-30 (citing NMRA, Rule 11-609; *State v. Mora*, 950 P.2d 789, 803 (N.M.

---

[34] The middle portion of this statement is inaudible on the FTR recording.

1997), *subsequently abrogated on other grounds by State v. Frazier*, 164 P.3d 1, 2 (N.M. 2007)).[35]

The NMSC also noted that the trial ruled only that the name and time frame of Duran's

convictions could be admitted, and that Duran testified to the "nature, facts and

circumstances leading up to his conviction . . . voluntarily . . . ." *Id.* Regarding Duran's

argument that he was treated unfairly on the stand compared to Finnell, the NMSC found

that it had not been presented to the district court and therefore was not preserved for

review. *Id.* However, the court also stated that Duran was not prohibited from inquiring

into the name of Finnell's prior felony conviction, even though his counsel chose not to do

so, and concluded that this argument was without merit. *Id.*

I find that the NMSC's decision on these claims was not an unreasonable application

of clearly established Supreme Court precedent or based on an unreasonable determination

---

[35] NMRA, Rule 11-609(A)(1) provides that evidence that a defendant has been convicted of a crime shall be admitted if (a) the crime was punishable by death or imprisonment in excess of one year under the law under which the defendant was convicted, *and* (b) "the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused . . . ."

When determining whether to admit evidence of a felony conviction under NMRA, Rule 11-609(A)(1), courts must also consider:

> (1) the nature of the crime in relation to its impeachment value as well as its inflammatory impact; (2) the date of the prior conviction and witness's subsequent history; (3) similarities, and the effect thereof, between the past crime and the crime charged; (4) a correlation of standards expressed in Rule 609(a) with the policies reflected in [Rule 11-404 NMRA 1997]; (5) the importance of the defendant's testimony, and (6) the centrality of the credibility issue.

*Mora*, 950 P.2d at 803 (citing *State v. Lucero*, 648 P.2d 350, 352-53 (N.M. Ct. App. 1982)).

of the facts.  28 U.S.C. § 2254(d).  Federal habeas corpus is highly limited in reviewing a

question regarding the admissibility of evidence because it is an area where trial courts

have broad discretion.  *Elliott*, 248 F.3d at 1214.  As a result, a federal court "will not disturb

a state court's admission of evidence of prior crimes, wrongs or acts unless the probative

value of such evidence is so greatly outweighed by the prejudice flowing from its

admission that the admission denies defendant due process of law."  *Knighton v. Mullin*,

293 F.3d 1165, 1171 (10th Cir. 2002) (citation omitted); *see also Smallwood v. Gibson*, 191 F.3d

1257, 1277 (10th Cir.1999) (stating that federal habeas courts will not disturb evidentiary

findings regarding the admission or prior crimes unless "the prejudice flowing from such

evidence is so great as to constitute a denial of federal constitutional rights by rendering

the trial fundamentally unfair.").

Here, this high standard simply cannot be met.  Although admitting evidence that

Duran had been convicted of voluntary manslaughter and battery on a police officer

undoubtedly had some prejudicial effect, it did not rise so high as to make the trial

fundamentally unfair.  Also, although the jury heard some of the details of these crimes,

in violation of the trial judge's ruling, Duran has not rebutted the NMSC's finding that

Duran testified to these details of his own volition and without objection from his counsel.

Duran's decision to describe the events leading to his prior convictions did not violate his

right to due process.[36]

Duran's second argument is, in essence, that his right to due process was violated because the jury heard the names of his two felony convictions but did not hear the name of Finnell's prior felony conviction. Although the NMSC initially appeared to dismiss the argument because it was not made before the trial court, it subsequently stated that the argument was "without merit" because it found that Duran was not prohibited from inquiring into the name of Finnell's conviction. *Doc. 10*, Ex. 4 at 30. Because the NMSC did not "clearly and expressly state" that its dismissal rested on a state procedural bar, federal habeas relief is still available for this claim. *Harris*, 489 U.S. at 263. However, I conclude that this claim is without merit for the same reason as the NMSC. Although Duran's counsel may have believed that he could not inquire into the name of Finnell's conviction due to a state law decision,[37] the trial judge did not rule that the name was inadmissible. *T1 at 9:19* (ruling that Duran could inquire into Finnell's prior felony). In the absence of such a ruling, Duran's trial certainly was not fundamentally unfair.

For the foregoing reasons, I recommend dismissal of this claim.

---

[36] His emotional testimony regarding his conviction for voluntary manslaughter may even have worked to his advantage, by explaining details of an otherwise amorphous crime and eliciting sympathy from the jury.

[37] Counsel referenced the state case of "Julio Tave." *T1 at 9:21-22.* The Court believes counsel was referring to *State v. Tave*, 122 N.M. 29, 31 (N.M. Ct. App. 1996), in which the court held that informing the jury of the name of a defendant's felony in a prosecution for felon in possession of a firearm was error.

VII.    Prosecutor's Remarks During Closing Argument

In his seventh claim, Duran argues that he was deprived of a fair trial when the prosecutor allegedly committed gross misconduct during his closing argument. *Doc. 1* at 21-23; *Doc. 20* at 26-33, Ex. 3 at 7-11. This claim was adjudicated on the merits by the NMSC on direct appeal, *Doc. 10*, Ex. 4 at 23-27, and so I will review it under the deferential standard set out in § 2254(d).

After reciting the evidence during his closing argument, the prosecutor played an audio recording of a portion of Duran's direct examination for the jury. *T4 at 9:15-9:19; see trial testimony at T3, 3:03-3:04.* On the recording, Duran was asked by his counsel if he knew where one of the Mexicans had shot Gallegos. The prosecutor told the jury in his closing argument that Duran replied with a "subconscious confession from the stand," saying "I, I shot him in the leg." *T4 at 9:16, 9:18-9:19.* The prosecutor also told the jury that Duran's counsel tried to "cover it up," when he responded "the guy shot him in the leg?" and repeatedly referenced "the guy" in his following questions. *T4 at 9:18.* Duran's counsel immediately moved for a mistrial, which was denied. *T4 at 9:18.* The prosecutor did not say again that Duran's counsel had covered up his client's statement, but he did play the recording again and state several more times that Duran had said "I shot him in the leg." *T4 at 9:18-9:19, 9:25-9:26.* Duran's counsel denied that interpretation of the evidence in his closing argument. *T4 at 10:08-10:09.*

When reviewing this claim on direct appeal, the NMSC held that the trial court did

not abuse its discretion in denying a mistrial based on the prosecutor's comment that Duran had subconsciously confessed from the stand. *Doc. 10*, Ex. 4 at 25. The court stated that when a prosecutor is alleged to have made improper comments in closing argument, "the question is whether the comments deprive the defendant of a fair trial." *Id.* at 24-25 (citing *State v. Smith*, 19 P.3d 254, 266 (N.M. 2001)). The court explained that although the prosecution and defense are both given wide latitude during closing argument, remarks by the prosecutor must still be based upon the evidence or be in response to the defendant's argument. *Id.* at 24 (citing *Smith*, 19 P.3d at 266). However, the court found that, in listening to the audio recording of Duran's testimony, "it is clear that [Duran's] statement regarding who shot [Gallegos] in the leg is subject to varying interpretations." *Id.* at 25. Thus, it concluded that the prosecutor's comment "was within the latitude afforded to him under our rules because it was a comment on [Duran's] testimony as admitted into evidence." *Id.* The court also found that "[b]y playing the audiotape of [Duran's] testimony, the prosecutor implicitly acknowledged that it was the jury's responsibility to determine which version of the evidence to accept." *Id.*

The NMSC also held that the trial court did not abuse its discretion in denying a mistrial based on the prosecutor's comment that Duran's counsel tried to "cover up" Duran's alleged slip-up. *Id.* Unlike the prosecutor's "subconscious confession" remark, however, the court found that this comment was "highly improper." *Id.* The NMSC stated that the comment "[reflected the prosecutor's] personal opinion unsupported by any

evidence in the record," and "encouraged the jury to evaluate [Duran's] innocence or guilt on the basis of defense counsel's alleged impropriety." *Id.* at 26. Despite admonishing the prosecutor, though, the court concluded that the comment was not so improper as to warrant a mistrial. *Id.* The NMSC found that the prosecutor did not repeat his suggestion of a "cover up," and cited another of its opinions for the "general rule" that "an isolated comment made during closing argument is not sufficient to warrant reversal." *Id.* (citing *State v. Fry*, 126 P.3d 516, 540 (N.M. 2005)). The court also noted that Duran's counsel timely objected, "alerting the jury to the prosecutor's conduct." *Id.*

I find that the NMSC's decision on this claim was not an unreasonable application of clearly established Supreme Court precedent or based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d). The Supreme Court has held that when prosecutorial misconduct does not implicate a specific constitutional right,[38] improper remarks warrant reversal only if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). In making this determination, courts must examine the entire proceedings, including "the strength of the evidence against the petitioner" and "[a]ny cautionary steps - such as instructions to the jury - offered by the court to counteract improper remarks . . . ." *Le v. Mullin*, 311 F.3d 1002, 1013 (10th Cir.

---

[38] Duran has not argued, nor do I find, that the prosecutor's remarks violated one of Duran's specific constitutional rights.

2002) (citing *Donnelly*, 416 U.S. at 643; *Darden*, 477 U.S. at 182).  Significantly, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden*, 477 U.S. at 181.  Instead, "[t]he ultimate question is whether the jury was able to fairly judge the evidence in light of the prosecutors' conduct."  *Bland v. Sirmons*, 459 F.3d 999, 1024 (10th Cir. 2006); *see also Le*, 311 F.3d at 1013 (same); *Tillman v. Cook*, 215 F.3d 1116, 1129 (10th Cir. 2000) (same).

The standard applied by the NMSC, "whether the comments [deprived Duran] of a fair trial," was not contrary to Supreme Court precedent and its application by the NMSC was not unreasonable.  The NMSC concluded that the prosecutor's "subconscious confession" line of remarks was not improper because it was a "comment on [Duran's] testimony as admitted into evidence," instead of a misstatement of the evidence.  *Doc. 10,* Ex. 4 at 25. This factual finding is presumed correct and Duran has not rebutted it.[39] Duran argues that these remarks were nonetheless improper because the prosecutor did not cross-examine him on his alleged confession, *Doc. 20* at 27, but the fact remains that the

---

[39] I also reach the same conclusion after my own review of the record.  Having listened to the audio recording, *T3 at 3:03-3:04*, I agree that Duran's statement is subject to multiple interpretations.  By playing the recording both before and after his comments, *T4 at 9:16, 9:18-9:19*, it was clear that the prosecutor was offering only his view of what Duran had said, which the jury could compare with the evidence it heard twice again.  By comparison, the prosecutor would unquestionably have misstated the evidence if he had instead told the jury simply that Duran confessed on the stand, without replaying the testimony, but this is not what happened.

prosecutor expressed only his opinion regarding evidence presented at trial.[40] Because the

"subconscious confession" remarks were not improper, they did not contribute to a denial

of due process.

Although the NMSC did find that the comment impugning the integrity of Duran's

counsel was improper, it was not unreasonable for the court to hold that the lone comment

did not produce sufficient unfairness to make Duran's conviction a denial of due process.

The comment was brief and immediately met with an objection and motion for a mistrial,

where Duran's counsel roared in front of the jury "don't ever, *ever* comment about what

---

[40] Duran also argues that the trial court should not have allowed the prosecutor
to replay the testimony because the recording was "too unreliable." *Doc. 20* at 28.
However, the record indicates that the recording used in the closing argument is
identical to Duran's testimony. *Compare T3 at 3:03-3:04, with T4 at 9:16, 9:18-9:19.* Duran
contends that it "was the trial court's obligation to have the official stenographer read
back the official stenographic transcript of the portion of defendant's disputed
testimony . . . ." *Doc. 20* at 28. Duran's preference for the written record is due to the
fact that the written log reflects Duran's testimony as "Guy shot him in the leg" which
differed from the prosecutor's interpretation of Duran's testimony. *See RP* at 292.. The
flaw in this argument is a basic one. The "official stenographic transcript" to which he
refers is nothing of the sort. Duran's trial was not recorded by a certified court reporter
who stenographically records the proceedings. *See* NMRA, Rule 22-301(B). Instead, an
audio recording was created under Rule 22-303. When a trial is recorded in such a
fashion, a "certified court monitor" supervises the creation of the audio recording and
produces a log which summarizes the testimony captured on the recording. *See* NMRA,
Rule 22-303; *see e.g. RP* at 304 ("Notice: This log is not the official record. The official
record is the digital disk. The log is created to assist in locating information on the
digital disk. The log is not a verbatim record of the proceedings."). Despite the creation
of the log, the recording is the official record of the proceedings. *See* NMRA, Rule 22-
201(C) ("the recording shall serve as the transcript unless otherwise ordered by the
court"); *see RP* at 304.

I might do."   *T4 at 9:18.*   Furthermore, the evidence brought against Duran was considerable and the jury was instructed that what was said in closing argument was not evidence.   *T4 at 8:26.*   It was not unreasonable to conclude that the jury could still fairly judge the evidence despite the prosecutor's comment.

For the foregoing reasons, I recommend dismissal of this claim.

VIII.   Sufficiency of the Evidence

In his eighth claim, Duran argues that because he was acquitted of armed robbery, there was insufficient evidence to support his conviction for first degree murder.   *Doc. 1,* Ex. 1 at 11; *Doc. 20,* Ex. 1 at 13-15.   Duran also argues that there was insufficient evidence to allow the jury to find that Duran engaged in a "willful, deliberate and premeditated killing," one of the elements of first degree murder under NMSA 1978, § 30-2-1(A).   *Doc. 1*, Ex. 1 at 11-12; *Doc. 20*, Ex. 1 at 13-20.   The first component of this claim was adjudicated on the merits by the NMSC on direct appeal, *Doc. 10*, Ex. 4 at 32-33, and so this Court will review it under the deferential standard set out in § 2254(d).   The second component has not been previously presented, but this court will address it on the merits.   *See* 28 U.S.C. § 2254(b)(2).

As noted, Duran was convicted of first degree murder of Gallegos but acquitted of armed robbery.   *RP* at 384-86, 404.   On direct appeal, the NMSC stated that in reviewing the record for sufficiency of the evidence, it must "determine whether the evidence, viewed in the light most favorable to the verdict, could justify a finding by any rational trier of fact

69

that each element of the crime charged has been established beyond a reasonable doubt."
*Doc. 10*, Ex. 4 at 32 (citing *State v. Apodaca*, 887 P.2d 756, 766 (N.M. 1994)).  In reviewing the
record, the court found the State had presented evidence that: (i) Duran went to Gallegos'
home armed with a gun; (ii) Duran argued with Gallegos over money and told Gallegos
he was going to shoot him if he did not give Duran some money; (iii) Duran and Gallegos
were the only people in Gallegos' home when shots were fired; and (iv) Duran was seen
leaving Gallegos' home after the shots were fired.  *Id.* at 32-33.  The NMSC then dismissed
this claim after concluding "[t]hat the jury did not find [Duran] guilty of armed robbery but
found him guilty of murder could mean nothing more than it did not find beyond a
reasonable doubt that [Duran] took property from [Gallegos] after shooting him."  *Id.* at 33.

I find that the NMSC's decision on this component of Duran's claim was not an
unreasonable application of clearly established Supreme Court precedent or based on an
unreasonable determination of the facts.  28 U.S.C. § 2254(d).  Under Supreme Court
precedent, evidence of guilt is sufficient if, when viewed "in the light most favorable to the
prosecution, *any* rational jury could have found the essential elements of the crime beyond
a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  The
NMSC correctly stated this standard and its application was not unreasonable.[41]

_____

[41] In order to find Duran guilty of armed robbery, the jury had to find that the
prosecution had proven several elements beyond a reasonable doubt that are not
among the elements of first degree murder.  *Compare* NMSA 1978, § 30-16-2, *with* NMSA
1978, § 30-2-1(A).

Although Duran did not argue the second component of this claim on direct appeal, I will address it on the merits.  Duran's argument is, in essence, that because the state's theory of the case was that Duran was "a desperate heroin addict who was short on money," it did not prove that he had the requisite state of mind to be convicted of first degree murder.  *Doc. 1*, Ex. 1 at 11-12.  Under New Mexico law, first degree murder requires a "willful, deliberate and premeditated killing," NMSA 1978, § 30-2-1(A), and Duran argues that the state's theory and evidence "[leaned] more to a careless and impulsive act . . . [w]hich falls more in favor of a mere unconsidered and rash impulse." *Doc. 20*, Ex. 1 at 15.

Duran overlooks the fact, however, that Finnell testified that Duran drew a gun while he argued with Gallegos about money.  *T1 at 3:51.*  According to Finnell, shots were not fired until after Finnell fled out the bedroom window, ran across the street to her mother's home, asked her mother to call 911, and attempted to return to Gallegos' home. *T1 at 3:52-3:57.*  Under New Mexico law, "deliberate intention is intention that is arrived at or determined upon as a result of careful thought and the weighting of the consideration for and against the proposed course of action."  *State v. Flores*, 266 P.3d 641, 648 (N.M. 2010) (internal quotation marks and citation omitted).  The NMSC has found deliberate intention when, after telling the victim to enter a nearby car, a defendant shot the victim as he approached the car.  *Coffin*, 991 P.2d at 506.  Here, viewed in the light most favorable to the prosecution, *Jackson*, 443 U.S. at 319, the evidence showed that at least a minute passed

before Gallegos was shot, after Duran threatened his life and drew a gun.  There was thus

ample evidence for a rational jury to conclude beyond a reasonable doubt that Duran had

committed a willful, deliberate, and premeditated killing.

Accordingly, I recommend dismissal of this claim.

IX.     Ineffective Assistance of Counsel

In his final claim, Duran argues that he received ineffective of assistance of counsel.

*Doc. 1*, Ex. 1 at 13-19; *Doc. 20*, Ex. 1 at 21-32, Ex. 2 at 1-24, Ex. 3 at 1-2.  In sum, Duran claims

that he received ineffective assistance when his counsel: (1) failed to move to suppress the

items found at 1017 Delta; (2) failed to move to suppress DNA test results of the blood

found on the jacket and shoes at 1017 Delta; (3) failed to move to sever Duran's drug-

related charges from his charges related to the homicide of Gallegos; (4) failed to

adequately cross-examine Mary Finnell; (5) failed to have the blood found in Duran's truck

independently tested; (6) waived Duran's speedy trial rights and stipulated to a six-month

continuance to test the blood, but then never tested it; (7) failed to move to suppress the

statements Duran made to Officer Yoakum before receiving *Miranda* warnings; (8) failed

during voir dire to strike five jurors who Duran claims were biased in favor of the

prosecutor; (9) failed to object to allegedly ambiguous jury instructions, failed to object to

jury communications with the trial judge in Duran's absence, and failed to poll the jury;

(10) failed to object and preserve several issues for appellate review; and (11) failed to

conduct a proper investigation and interview witnesses before trial, call sufficient witnesses

for Duran's defense, and impeach Officer Yoakum and Robert Judd during cross-examination.

Duran raised the first, third, fourth, seventh, and eighth claims on direct appeal, *Doc. 10*, Ex. 2 at 52-53, and all were denied on the merits by the NMSC.  *Doc. 10*, Ex. 4 at 31. Duran raised the second, fifth and sixth claims in his state habeas petition, *Doc. 10*, Ex. 5 at 4-5, 8-9, which was summarily denied by the district court and then the NMSC after Duran petitioned for a writ of certiorari.  *Doc. 10*, Ex. 6 at 1-2, Ex. 7 at 54.  As I have previously found, the NMSC's summary denial was an adjudication "on the merits."  As a result, I must review the first eight of Duran's ineffective assistance claims under the deferential standard set out in § 2254(d).

However, as I have determined in other orders, Duran's ninth, tenth and eleventh claims were not raised before the state courts and are unexhausted.  *Docs.* 23, 30.  For the sake of efficiency and because I am convinced that these claims have no merit, I will review these claims on the merits.  28 U.S.C. § 2254(b)(2)*; Hoxsie v. Kerby*, 108 F.3d 1239, 1242-43 (10th Cir. 1997) (permitting courts to address the merits of unexhausted claims when "the interests of comity and federalism will be better served by addressing the merits forthwith" and if a court "is convinced that the petition has no merit . . . .").  Because these last three claims were not adjudicated "on the merits" by state courts, I must review them *de novo* instead of under the deferential standard set out in § 2254(d).  *Hooks*, 184 F.3d at 1223.

To establish ineffective assistance of counsel, a petitioner must show both that (1)

his counsel's performance was unconstitutionally deficient, and that (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). An ineffective assistance claim fails if either of these prongs cannot be met, and a court need only address one prong if a petitioner cannot satisfy it. *Id.* at 697.

Regarding the first *Strickland* prong, a counsel's performance does not satisfy the standard guaranteed by the Sixth Amendment if it falls below "an objective standard of reasonableness." *Id.* at 687-88. However, "[j]udicial scrutiny of counsel's performance must be highly deferential" because it is easy to include, after the fact, that counsel's decisions were unreasonable after they proved unsuccessful. *Id.* at 689. Accordingly, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* Counsel's performance must be considered along with all the circumstances of the case. *Id.* at 688, 690. Furthermore, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (citation and internal quotation marks omitted). Situations are rare in which the "'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." *Harrington*, 131 S.Ct. at 779 (quoting *Strickland*, 466 U.S. at 689).

74

To establish prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. It is insufficient to show merely that "errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Instead, a petitioner must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

In *Harrington*, the Supreme Court stressed that "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult" because both standards are "highly deferential." 131 S.Ct. at 788. As a result, review in this context is "doubly" deferential, and the Court warned against "equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)." *Id.* When considering the summary denial of a petitioner's claims of ineffective assistance of counsel, as I must do here, the Court explained that a habeas court must "determine what arguments or theories . . . could have supported . . . the state court's decision; and then . . . ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Id.* at 786. The Court emphasized that when § 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* at 788.

I will now address each of Duran's ineffective assistance claims in turn.

### 1.  Failure to Suppress Items Found at 1017 Delta

Duran argues that his counsel was ineffective for failing to suppress evidence that the police took from his residence at 1017 Delta pursuant to a search warrant.  *Doc. 1*, Ex. 1 at 14-16; *Doc. 20*, Ex. 1 at 25-27.  The items taken included narcotics, drug paraphernalia, two shotgun shell rounds, a 9-millimeter bullet, and various clothing stained with blood. *T3 at 9:33, 9:36-9:38, 9:48-9:52*.  Duran argues that he was prejudiced by the admission of this evidence at trial because the bullet created an inference that Duran had fired the 9-millimeter bullets that killed Gallegos, *T2 at 2:13*, and the bloody clothes made it look as if Duran had shot Gallegos. *Doc. 20*, Ex. 1 at 25-26.

There are reasonable arguments both that Duran's counsel's performance was objectively reasonable and that any deficient performance here did not meet the *Strickland* standard for prejudice.  As to performance, Duran has not provided any evidence that a motion to suppress this evidence would have been meritorious.  The home at 1017 Delta was searched pursuant to a search warrant, and there is no indication that it was illegally obtained.  *T3 at 9:31-9:32.*  It would have been reasonable for the NMSC to conclude that, in failing to file an unmeritorious motion to suppress, Duran's counsel's performance did not fall outside the wide range of reasonable professional assistance tolerated by *Strickland*. It also would have been reasonable to conclude that Duran's counsel chose not to attempt to suppress the bloody clothes for strategic reasons, given that DNA testing determined

that the blood was a positive match to Duran and was excluded as a match to Gallegos. *T3 at 9:57, 10:53-10:54.* This result corroborated Duran's testimony and hurt the prosecution's case.

For these same reasons, it would have been reasonable to conclude that there was not a reasonable probability of a different result if Duran's counsel had moved to suppress the evidence. There is no indication that the motion would have been successful, and some of the evidence actually helped Duran at trial.

For the foregoing reasons, I recommend dismissal of this claim.

### 2.  Failure to Suppress DNA Test Results

Duran next argues that his counsel was ineffective for failing to suppress the DNA test results of the blood found on the jacket and shoes taken from 1017 Delta. *Doc. 1,* Ex. 1 at 16; *Doc. 20,* Ex. 1 at 27-28. He states that, although it can be argued that his counsel's strategy was to show that none of the blood on Duran's clothes belonged to Gallegos, "the other argument" is that without test results, the jury would not have pictured Duran fleeing the crime scene covered with blood *Doc. 20*, Ex. 1 at 27-28.  Duran's concession, however, establishes why Duran's counsel's decision was within the "wide latitude counsel must have in making tactical decisions." *Strickland,* 466 U.S. at 689.  Furthermore, for the same reasons provided in discussion of Duran's first ineffective assistance claim, it would have been reasonable for the NMSC to conclude that the presence of the test results did not prejudice Duran.  Accordingly, I recommend dismissal of this claim.

### 3.  Failure to Sever Charges

Duran next argues that his counsel was ineffective in failing to move to sever his drug-related charges from the charges related to the homicide of Gallegos.  *Doc. 1*, Ex. 1 at 16; *Doc. 20*, Ex. 1 at 28-31.  Duran contends that if the charges had been severed, the drugs and drug paraphernalia found at 1017 Delta would not have been admissible at his trial for the murder of Gallegos.  *Doc. 1*, Ex. 1 at 16; *Doc. 20*, Ex. 1 at 28.  He argues that the admission of this evidence prejudiced him because it caused the jury to convict him of murder due to its view that Duran was "generally . . . a bad person," instead of convicting him because of the State's evidence for its murder charge.  *Doc. 20*, Ex. 1 at 29-31.

Once again, there are reasonable arguments both that Duran's counsel's performance was objectively reasonable and that any deficient performance here did not meet the *Strickland* standard for prejudice.  New Mexico law provides, in relevant part, that "two or more offenses shall be joined in one . . . indictment" if they are "based on the same conduct or on a series of acts either connected together or constituting parts of a single scheme or plan."  NMRA, Rule 5-203(A)(2).  After he was arrested, Duran told police that he had visited Gallegos immediately before the murder to purchase heroin and completed the sale.  *RP* at 467-469.  Duran repeated these statements at trial, *T3 at 2:51-2:52*, and also testified that he returned to 1017 Delta, where the drugs and paraphernalia were found, after Gallegos' murder.  *T1 at 2:57-2:58*.  Finnell testified that immediately before the murder, Duran had argued with Gallegos about money, drawn a gun, and threatened

Gallegos' life.  *T1 at 3:49-3:51.*  It would have been reasonable for the NMSC to conclude

that the motion to sever would be denied given that the charges were based on a series of

acts connected together.  As such, defense counsel's failure to file a motion to sever charges

would not be objectively unreasonable nor would it have prejudiced Duran.

Furthermore, it would not have been unreasonable for the NMSC to conclude that

the admission of the drugs and paraphernalia did not prejudice Duran, even if it believed

that the charges would have been severed upon Duran's counsel's motion.  "In making the

determination whether the specified errors resulted in the required prejudice, a court

should presume, absent challenge to the judgment on grounds of evidentiary insufficiency,

that the judge or jury acted according to law."  *Strickland*, 466 U.S. at 694.  Here, the jury

was told both before and after the trial to consider each charge separately, *T1 at 2:33, T4 at

8:15*, and Duran has not shown that the jury disregarded these instructions and convicted

him of murder because of the evidence of Duran's drug use.

Accordingly, I recommend dismissal of this claim.

4.  Failure to Adequately Cross-Examine Mary Finnell

Duran next argues that his counsel was ineffective for failing to adequately cross-

examine Finnell.  *Doc. 1*, Ex. 1 at 16-17; *Doc. 20*, Ex. 1 at 32, Ex. 2 at 1-3.  Duran's pleadings

make clear, however, that the basis for this claim is his counsel's failure to cross-examine

Finnell regarding her pending and previously dismissed charges.  These cross-examination

topics were actually prohibited by the trial court.  *T1 at 9:18-9:19*; *see supra pp. 46-47.*  As

79

discussed above, though this prohibition was constitutional error, the NMSC could reasonably have concluded that the error was harmless beyond a reasonable doubt. *See supra pp. 45-60.* For purposes of this claim, Duran's counsel was certainly not ineffective for failing to inquire into topics on cross-examination that were prohibited by the trial court. Duran's counsel argued for Duran's right to inquire into Finnell's pending charges and was overruled. *T1 at 8:20, 8:52-8:54, 9:08-9:19*

To the extent that this claim can be taken to argue that Duran's counsel was ineffective for not eliciting the name of Finnell's prior conviction on cross-examination, it would have been reasonable for the NMSC to conclude that in this omission counsel's performance did not fall below an objective standard of reasonableness. The record suggests that Duran's counsel did not elicit the name of Finnell's prior conviction because he thought he was prohibited from doing so due to a state law decision. *T1 at 9:22* (referencing *State v. Tave*, 919 P.2d 1094 (N.M. Ct. App. 1996)). While a review of the record after the fact reveals that the trial judge did not prohibit such cross-examination, this is a distinction that could easily have been missed during rushed pretrial motions on the morning of trial and in light of the trial judge's prohibition of cross-examination regarding Finnell's pending charges. Furthermore, the Supreme Court recently reiterated that "*Strickland* does not guarantee perfect representation, only a 'reasonably competent attorney.'" *Harrington*, 131 S.Ct. at 791 (*quoting* 466 U.S. at 687). The Court also stated that "it is difficult to establish ineffective assistance when counsel's overall performance

indicates active and capable advocacy." *Id.* Here, Duran's counsel thoroughly and effectively cross-examined Finnell for almost an hour regarding her own drug use, her limited perception on the night of murder, and inconsistencies in her trial and grand jury testimony, among other topics. *T1 at 4:05-4:56.* Despite Duran's counsel isolated mistake regarding the name of Finnell's prior conviction, his cross-examination was overall quite strong.

Additionally, it would have been reasonable for the NMSC to conclude that there was not a reasonable probability that the result of Duran's trial would have been different if the jury had learned the name of Finnell's prior felony conviction, instead of learning only that she had a prior conviction. Accordingly, I recommend dismissal of this claim.

### 5. Failure to Test the Blood Found in Duran's Truck

Duran next argues that his counsel was ineffective in failing to conduct DNA testing of the blood found in Duran's truck. *Doc. 20*, Ex. 2 at 3-4. Duran asserts that his counsel was authorized to independently test the blood by statute, yet relied on the State to conduct the testing even though the State had no obligation to test evidence that was only potentially exculpatory. *Id.* at 3. Duran contends that his counsel's failure prejudiced him because he was unable to establish at trial that the blood was not Gallegos' and the jury was free to make that inference. *Id.* at 4.

This argument is virtually foreclosed by the Supreme Court's decision in *Harrington*. 131 S.Ct. at 788-90. In *Harrington*, the petitioner, who had been convicted of murder,

argued that his counsel was ineffective for failing to have blood found at the murder scene tested.  *Id.* at 777.  The petitioner claimed that testing the blood would have yielded results which would have revealed to whom the blood belonged and bolstered petitioner's account of events.  *Id.*  The Court in reversing the grant of habeas relief explained that a reasonable attorney may choose not to conduct the testing because the results may actually undercut his client's story.  *Id.* at 789-90 ("An attorney need not pursue an investigation that would  be fruitless, much less one that may be harmful to the defense.").  Given the deference which a federal court must pay the state court's determination that counsel was not ineffective, the Court held that habeas relief could not be granted in such a circumstance.  *Id.*

The instant case mirrors *Harrington* closely.  The state court has rejected Duran's claim that his counsel was constitutionally ineffective.  It would have been reasonable for the NMSC to conclude that Duran failed to show that his counsel's performance fell below an objective standard of reasonableness.  As explained in *Harrington*, Duran's counsel could have feared that testing of the blood would undermine his client's story.[42]  It also would have been reasonable for the NMSC to conclude that Duran failed to show any prejudice

---

[42] While new evidence must have "no bearing" on my review of this claim, *Cullen*, 131 S. Ct. at 1400, it is worth noting again that such fear would have been justified given that the results would have shown that some of the blood was consistent with the DNA profile of Gallegos.  *Doc. 28* at 15.

due to the failure to test the blood.  Given that the NMSC's rejection of this ineffective of

assistance claim was reasonable, I recommend denial of this claim.

### 6.  Waiving Speedy Trial Rights and Stipulating to a Six-Month Continuance So That Blood Could Be Tested

Duran next argues that his counsel was ineffective in agreeing to a six-month

continuance to allow blood evidence to be tested before Duran's trial  and agreeing that

such a delay would not prejudice Duran.  *RP* at 85,  *Doc. 1*, Ex. 1 at 17-18; *Doc. 20*, Ex. 2 at

4-5.  This claim largely restates Duran's arguments regarding his counsel's failure to have

the blood found in Duran's truck tested, once he obtained the continuance.  For the reasons

just given, this failure to test does not make out a successful ineffective assistance claim.

To the extent Duran argues that the stipulation and waiver of his speedy trial rights

was itself ineffective assistance, it would have been reasonable for the NMSC to conclude

that counsel's decision fell within the wide range of reasonable professional assistance

permitted by the Sixth Amendment.  When faced with Duran's case from the beginning,

defense counsel had, broadly speaking, three possible strategies with respect to the blood

testing.  First, defense counsel could have attempted to get to trial as soon as possible.  Such

a strategy would have the likely consequence that the blood would not be tested.  This

strategy would be best if counsel feared that the results would undermine Duran's defense

and would ensure that he could argue to the jury that the state had failed to conduct a

sufficient investigation due to the failure to test the blood.  However, the strength of the

"insufficient investigation" argument would be weakened by the relative short time between the crime and the trial.  In other words, a jury might be more likely to excuse the failure to test the blood if they concluded there had not been enough time to do so.  A second strategy would be to give the state one continuance for the purpose of testing the blood.  This strategy would enable the defense to utilize the results if they were supportive of the defense and, if the testing did not occur, would make the "insufficient investigation" argument significantly stronger.  A third strategy would be to do whatever was necessary – either by granting additional continuances or by the defense arranging for the testing – to ensure that the blood results were known by the time of trial.  As explained above, this strategy holds great risk if the results come out the "wrong" way.  Duran's counsel selected the second strategy.  He agreed to one continuance, but when the testing still had not been completed, he demanded the trial go forward immediately.[43]  He made the most out of the state's failure to test the blood.  He attempted to have the case dismissed by the judge and he argued the state's failure to test before the jury.

The selection of any of these approaches involved some risks, but it was the epitome of a strategic decision and not challengeable given the "wide latitude counsel must have

_____

[43]  "[A]nd I don't want another continuance.  My client has been in jail now since January of 2004.  I don't want another continuance.  I want to try this case, but I don't want to try it in an unfair situation and I'm at a great disadvantage today on behalf of the defense and I think the only remedy in these cases, in these instances, and it has to be done, some district judge somewhere in the state has to take the bull by the horns, so to speak, and do something about this crime lab stuff."  *T1 at 8:21.*

in making tactical decisions." *Strickland*, 466 U.S. at 689.  Without question, the NMSC's rejection of this ineffective of assistance claim was reasonable.  Accordingly, I recommend denial of this claim.

### 7.  Failure to Suppress Statements Made By Duran Before Receiving *Miranda* Warnings

Duran next argues that his counsel was ineffective for failing to file a pre-trial motion to suppress the statements Duran made to Officer Yoakum before he was given *Miranda* warnings.  *Doc. 1*, Ex. 1 at 18-19; *Doc. 20*, Ex. 2 at 6.  As previously discussed, Officer Yoakum testified to these statements at trial and the NMSC held on direct appeal that their admission was a constitutional error in violation of Duran's Fifth Amendment rights. *Doc. 10*, Ex. 4 at 17.  However, the NMSC found that the error was harmless beyond a reasonable doubt.  *Id.* at 23.

The issue of whether the NMSC could reasonably have found that counsel's failure to file a pre-trial motion fell below an objective standard of reasonableness may be set aside, because of the court's finding that the resulting constitutional error was harmless beyond a reasonable doubt.  Having already made that finding, it would have been reasonable for the NMSC to conclude that there was not a reasonable probability that the result of Duran's trial would have been different if his counsel had filed a pre-trial motion to suppress.  As a result, Duran cannot show prejudice and I recommend dismissal of this claim.

### 8.  Failure to Move to Strike Jurors During Voir Dire

In his eighth claim, Duran argues that his counsel was ineffective in failing to move to strike certain jurors during voir dire.  *Doc. 20*, Ex. 2 at 8-12.  Duran contends that five of his jurors were biased against him due to their connections to law enforcement officers, and that he suffered prejudice when his counsel failed to strike them.  Specifically, Duran notes that: (i) juror Nikki Burdine's father was a police and jail administrator in the county where Duran was tried, *T1 at 11:28-11:29*; (ii) juror Christine Williamson was married to a police officer, *T1 at 11:29-11:30*; (iii) juror Lisa Doran's uncle was a police officer in Las Cruces, *T1 at 11:30*; (iv) as a mechanic, juror Timmy Hickman had worked on the cars of two of the police officers testifying for the prosecution and knew them through that relationship, *T1 at 10:12-10:13*; and (v) juror Maria Waters personally knew the prosecutor, Matthew Chandler, because they attended the same church.  *T1 at 9:50*.

"Defense counsel's failure to attempt to remove from the jury a person who has been established on voir dire to be biased constitutes prejudice under *Strickland*."  *Hale v. Gibson*, 227 F.3d 1298, 1319 (10th Cir. 2000) (citation omitted).  However, to show that a juror was biased, "a defendant must show that the juror had such a fixed opinion that he or she could not judge impartially."  *Id.* (citing *Patton v. Yount*, 467 U.S. 1025, 1035 (1984)).  The Supreme Court has held that even if a juror has some "preconceived notion as to the guilt or innocence of an accused . . . . [i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."  *Irvin v. Dowd*, 366

U.S. 717, 723 (1961) (superseded on other grounds by statute).  Regarding the performance prong of *Strickland*, the Tenth Circuit has stated that "[a]n attorney's actions during voir dire are considered to be matters of trial strategy.  A strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill chosen that it permeates the entire trial with obvious unfairness."  *Nguyen v. Reynolds*, 131 F.3d 1340, 1349 (10th Cir. 1997) (citing *Teague v. Scott*, 60 F.3d 1167, 1172 (5th Cir.1995)); *see also United States v. Taylor*, 832 F.2d 1187, 1196 (10th Cir. 1987) ("[T]he use of peremptory challenges to construct a fair and impartial jury panel will normally fall squarely within the realm of a tactical trial decision.").

It would have been reasonable for the NMSC to conclude that Duran's counsel's performance during voir dire fell within the wide range of reasonable professional assistance permitted by the Sixth Amendment and that his failure to strike these witnesses was not objectively unreasonable.  Under New Mexico law, when a trial involves a charge punishable by life imprisonment, as occurred at Duran's trial, the defense is allowed to strike twelve jurors without cause, using peremptory challenges.  NMRA, Rule 5-606(D). The audio recording for the attorneys' use of peremptory challenges in this case is incomplete;[44] however, the written log for these proceedings indicates that Duran's counsel

---

[44] Most of the voir dire proceedings in this case were recorded onto the cassette tape labeled as "Jury-Voir Dire CR-1," where they can be heard.  However, the written log indicates that the final portion of the proceedings, including some of the peremptory challenges of counsel, were recorded onto the cassette tape labeled as "JT/Voir Dire CR-

exercised ten peremptory challenges.  *RP* at 208-09.  The record thus shows that counsel

actively used his challenges.  Although it appears that Duran's counsel could have used

two additional peremptory challenges and chose not to use one on Mr. Hickman after

unsuccessfully trying to strike him for cause, *Jury-Voir Dire CR-1*,[45] it would have been

reasonable for the NMSC to conclude that these were strategic decisions that did not

permeate Duran's trial with unfairness.

It would also have been reasonable for the NMSC to conclude that the presence of

the contested individuals on Duran's jury did not prejudice him.  All five of the jurors with

connections to law enforcement officers said that they would be fair and impartial in

Duran's trial.[46]  *T1 at 9:50-9:51, 10:12-10:13, 11:28-11:30.*  The situation thus did not resemble

cases in which counsel was found to be ineffective for failing to strike biased jurors, and

permitted the NMSC to conclude that Duran could not show prejudice.  *Compare Hughes*

*v. United States*, 258 F.3d 453, 460-64 (6th Cir. 2001) (holding that counsel was ineffective

for failing to ask follow-up questions or strike a juror who declared unequivocally during

---

2."  There does not appear to be any content on this tape.  The voir dire proceedings
were not recorded onto any compact discs.

[45] This citation is to the cassette tape with this label.

[46] It must be noted that when asked whether she would give "more credibility
and leeway to Mr. Chandler because of her friendship with him, Maria Waters did
initially respond "that would be hard to say.  I do respect him as a person."  *T1 at 9:51.*
However, she continued that "I would think that I would be open enough to hear both
sides and make a fair and impartial call."  *Id.*

voir dire that "I don't think I could be fair"), *and Johnson v. Armontrout*, 961 F.2d 748, 751, 754-56 (8th Cir. 1992) (holding that counsel was ineffective for failing to strike two jurors who stated unequivocally during voir dire that they believed defendant was guilty of a robbery charge and who had served on a previous jury that convicted another man of taking part in the same robbery), *with Hale*, 227 F.3d at 1320 (holding that counsel's failure to strike allegedly biased jurors who all said that they could judge the case impartially on the evidence was not ineffective assistance of counsel).

    For the foregoing reasons, I recommend dismissal of this claim.

### 9.   Failure to Object to "Ambiguous" Jury Instructions; Failure to Object to Communications Between the Jury and Trial Judge in Duran's Absence; and Failure to Poll the Jury

    In his ninth claim, Duran argues that his counsel was ineffective in failing to object to jury instructions that Duran believes were ambiguous; in failing to object to communications between the jury and trial judge in Duran's absence; and in failing to poll the jury after Duran was convicted. *Doc. 20*, Ex. 2 at 12-17.   As previously noted, this and all of Duran's remaining claims are unexhausted but I have decided to review them on the merits.   As a result, I review this and all remaining claims *de novo*.

### a.  Failure to Object to Jury Instructions

    Duran argues that his counsel should have objected to the jury instructions because they misrepresented the state of mind the jury had to find in order to convict Duran of first degree murder.  *Doc. 20*, Ex. 2 at 13-14.  Duran also implies that the jury was not told the

proper elements of his charged crimes. *Id.* at 14.  Consequently, Duran contends that his counsel was ineffective in failing to object to the instructions and that Duran was prejudiced as a result.

I find that the jury instructions at Duran's trial were proper and therefore that his counsel was not ineffective in declining to object.  When considering jury instructions, a reviewing court must determine "whether the instructions state the governing law and whether the jury was provided an intelligent, meaningful understanding of the applicable issues and standards." *United States v. Laughlin*, 26 F.3d 1523, 1528 (10th Cir. 1994) (citation omitted).  A reviewing court can reverse only if it has "substantial doubt that the jury was fairly guided . . . ." *United States v. Smith*, 13 F.3d 1421, 1424 (10th Cir. 1994) (citation omitted).  Duran has submitted the jury instructions given at his trial, *Doc. 20*, Ex. 5 at 8-30, and they match the instructions that can be heard on the audio record.  *T4 at 8:12-8:27*. These instructions reveal that the jury was told the correct elements for each of Duran's charged crimes and their lesser included offenses: First Degree Murder, Felony Murder, Second Degree Murder, Armed Robbery, Possession of Methamphetamine, Possession of Heroin, Possession of Drug Paraphernalia, and Felon in Possession of a Firearm.  *Doc. 20*, Ex. 5 at 16-28.  The instructions properly stated the governing law and provided intelligent understanding of the appropriate standards.

Most of Duran's objections pertain to a general element  instruction, in which the jury was told that "the state must prove to your satisfaction beyond a reasonable doubt that

the defendant acted intentionally when he committed the crime." *Id.* at 29.  Duran argues

that this sentence watered down the mental state the jury had to find in order to convict

him of first degree murder and robbery, or at least confused the jury as to the appropriate

standards.  However, this instruction clearly stated that the jury had to find that Duran

acted intentionally "in addition to the other elements" of all his charged crimes, which had

been previously read.  *Id.*  In the first degree murder instruction, the jury was told it had

to find that Duran acted with "deliberate intention," which "means arrived at or

determined upon as a result of careful thought and the weighing of the consideration for

and against the proposed course of action.[47]  *Id.* at 16.  I find that this instruction did not

confuse the jury or unfairly guide it.  To the contrary, this instruction actually provided

extra protection to Duran.[48]  Consequently, Duran's counsel was not ineffective in failing

to object to the jury instructions and Duran's arguments regarding this issue have no merit.

  b.  Failure to Object to Communications Between the Jury and Trial Judge in
Duran's Absence

Duran next argues that his counsel was ineffective in failing to object to

communications between the jury and trial judge.  Duran also argues that the trial judge

---

[47] The jury was also told that "[a] mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill.  To constitute a deliberate killing, the slayer must weigh and consider the question of killing and the slayer's reasons for and against such a choice." *Id.* at 16.

[48] This is particularly true for Duran's armed robbery charge, which, consistent with governing law, NMSA 1978, § 30-16-2, did not have a mental state requirement in its jury instruction.  *Doc. 20*, Ex. 5 at 22.

erred in not disclosing the communications and giving him a chance to be heard before the judge responded to the communications. *Doc. 20*, Ex. 2 at 15-16. I construe this second argument as a distinct claim, and will address it before reaching Duran's ineffective assistance claim regarding this matter.

On the morning of trial, the judge told the jury that if it had questions after witnesses testified, it could write the questions down and submit them to the judge through the bailiff. *T1 at 2:37*. The judge explained that if he decided a question was proper, he would ask it in open court, but if not no response would be given. *T1 at 2:37-2:38*. The Record Proper indicates that the jury sent several written questions to the judge during trial, *RP* at 159-163, and the time stamps show that three of these questions were sent while the jury was deliberating. *RP* at 159, 163. While there is no indication in the Record Proper or audio record that any of the questions were asked or answered in open court, the Record Proper does show that the judge sent a written response to one of the questions the jury submitted while it was deliberating.[49] *RP* at 164. While deliberating, the jury sent a note that reads "We would like to hear Finnelle's [sic] testimony and the 911 tape of Mr. Judd and the testimony of Mr. Duran." *RP* at 163. The Record Proper includes a typed response

---

[49] There is a written notation below another question that the jury sent while it was deliberating, but it does not appear to be a response from the judge to the jury. The jury question reads "We do not have Mr. Judd's 911 call.  Are you getting this for us?" *RP* at 159. A handwritten note below the question reads "Monitor went in + found tape for jurors."  *RP* at 159.

that reads "Response to Note #2.  We are providing to you the 911 tape of Mr. Judd.  As to the testimony of Mary Finnell and Mr. Duran, you are required to rely upon your memory."  *RP* at 164.  The response appears to be signed by the trial judge.

Duran claims that he was not aware of these notes during trial, and only learned of them when he received the Record Proper during postconviction proceedings.  *Doc. 20*, Ex. 2 at 16.  Duran argues that if his counsel had told him about the notes sent during trial, Duran would have incorporated the substance of the jury's questions into his testimony and aided his case.  *Id.*  However, the record does not indicate whether Duran's counsel knew of the communications.  For this reason, I will address Duran's claim of error by the trial judge before reaching the issue of whether his allegations, considered along with the record, make out a meritorious claim of ineffective assistance of counsel.

A criminal defendant has a fundamental right to counsel and to be present during all critical stages of his trial.  *E.g., Rushen v. Spain*, 464 U.S. 114, 117 (1983).  As a result, "[a] question from the jury must be answered in open court and only after providing counsel an opportunity to be heard."  *Smallwood*, 191 F.3d at 1279 (quoting *United States v. Carter*, 973 F.2d 1509, 1515 (10th Cir. 1992)).  Although the Tenth Circuit has "not described in detail what constitutes an 'improper' communication between judge and jury," *Bodine v. Warden of Joseph Harp Corr. Ctr.*, 217 F. App'x 811, 816 (10th Cir. 2007) (unpublished), it can be presumed that a question from the jury that is not answered in this manner will usually constitute an *ex parte* communication and constitutional violation.  *See Rushen*, 464 U.S. at

93

119 ("When an *ex parte* communication relates to some aspect of the trial, the trial judge generally should disclose the communication to counsel for all parties."); *Carter*, 973 F.2d at 1515 (holding that a judge's desire to avoid keeping the jury waiting did not undo constitutional error that occurred when the judge responded to a note from the jury during deliberations without informing counsel). However, such violations are subject to harmless error analysis; they do not trigger *per se* reversal. *Rushen*, 464 U.S. at 117-22 & n.2; *Carter*, 973 F.3d at 1515-16. When an *ex parte* communication does not receive an objection at trial, a reviewing court must determine whether the record as a whole "completely [negates] any reasonable possibility of prejudice arising from such error." *Carter*, 973 F.3d at 1515.

Here, at absolute most the note from the judge to the jury was a constitutional error that is subject to harmless error analysis. Duran claims that he did not know of the communication and there is no indication in the record that his counsel was made aware of it. Even if this was the case, however, I easily conclude that there was no reasonable probability of prejudice due to the communication and that any error was harmless beyond a reasonable doubt. The two components of the judge's response – (a) that the jury would be given the 911 tape of Judd, and (b) that the jury must rely on its memory regarding the testimony of Finnell and Duran – merely reiterated prior rulings made by the judge in open court. The judge had previously entered the 911 tape of Judd into evidence, *see T1 at 5:39*, *RP* at 321 (exhibit 14 on exhibit list), and told the jury that it would have to rely on its memory of the evidence presented at trial during deliberations. *T1 at 2:37.* These

circumstances are thus highly similar to those in *Carter*, where the Tenth Circuit found that a note sent by the judge to the jury without the knowledge of counsel was a constitutional error but harmless because the communication "was substantially identical to the court's previous jury instructions given in the presence of [the defendant] and his counsel." 973 F.2d at 1515. Because there was no possibility that the judge's communication prejudiced Duran, I find that Duran's claim of error by the trial judge has no merit.

Having reached this conclusion, I also find that Duran has no meritorious claim of ineffective assistance of counsel regarding the jury communications. Even if Duran's counsel did know of the note sent by the judge and did not tell Duran, which cannot be discerned from the record, there is not a reasonable probability that the result of the proceeding would have been different if Duran had learned of the note. The jury's requests had already been resolved by prior rulings of the trial judge. At most, Duran could have perhaps persuaded the judge to not respond to the question about his and Finnell's testimony, but this would not have changed the evidence the jury considered while deliberating. Even if Duran's counsel did fail to inform him of the note from the jury and the judge's response, Duran was not prejudiced as a result.

As for the other questions from the jury, there was no error by the trial judge because there is no indication that any of them were answered."[50] *Smallwood*, 191 F.3d at

---

[50] The Tenth Circuit has rejected an argument of a habeas petitioner that a lack of a record indicates that improper *ex parte* communications occurred between the judge

1279.  There is also no indication that Duran's counsel ever learned of them, because the trial judge ruled that he would decide if the questions were proper before reading them in open court.  *T1 at 2:37-2:38*.  Duran's counsel was not ineffective for failing to object to or inform Duran about notes that he never learned of himself.

For the foregoing reasons, I find that Duran's arguments on this issue have no merit.

c.  Failure to Poll the Jury

Duran next argues that his counsel was ineffective in failing to poll the jury after it announced its verdict.  *Doc. 20*, Ex. 2 at 17.  After the chairperson of the jury read the verdict form, Duran's counsel told the court that he did not wish to poll the jury.  *T4 at 2:31*.  While Duran argues that he had an "absolute right" to poll the jury upon his timely request, he does not indicate that he had asked his counsel to poll the jury or that his counsel defied Duran's wishes.  Additionally, Duran has not shown a reasonable probability that the result of his proceeding would have been different if the jury had been polled.

For all of these reasons, I recommend dismissal of this claim.

---

and jury.  *Smallwood*, 191 F.3d at 1280 n.14.  The court stated that "[p]etitioner's pure speculation about what did or did not occur between the judge and jury cannot form the basis of habeas relief."  *Id.*

### 10.  Failure to Object and Preserve Issues for Appellate Review

Duran next argues that his counsel was ineffective in failing to object and preserve several issues for appellate review.  Duran argues that he was prejudiced by: (1) his counsel's failure to raise a "lost evidence" argument at trial when arguing that Duran was prejudiced by the absence of DNA test results for the blood found in Duran's truck; (2) his counsel's failure to argue that Duran and Finnell were treated unequally because the jury heard the names of two of Duran's prior felony convictions but did not hear the name of Finnell's prior felony conviction; and (3) his counsel's failure to argue that Kwasigroch's written statement and the statements of Kwasigroch and the "young man" in Officer Rollins' report should have been admitted under the present sense impression exception to the hearsay exclusion, that the exclusion of these statements violated Duran's Fifth Amendment right to a fair trial and Sixth Amendment right to present a defense, and his counsel's failure to comprehend that Officer Rollins' report was not entirely excluded from evidence.  *Doc. 20*, Ex. 2 at 7-8.  These arguments were all deemed to have been waived on direct appeal.  *Doc. 10*, Ex. 4 at 9-12, 14, 30.

The Supreme Court has recently warned against using "[a]n ineffective assistance claim [to] function as a way to escape the rules of waiver and forfeiture and raise issues not presented at trial."  *Harrington*, 131 S. Ct. at 788.  Because "intrusive post-trial inquiry" into such issues can "threaten the integrity of the very adversary process the right to counsel is meant to serve," the Court warned that "the *Strickland* standard must be applied with

scrupulous care." *Id.* This aversion to disrupting the adversarial process reflects the propositions that "*Strickland* does not guarantee perfect representation, only a reasonably competent attorney," and that "it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." *Id.* at 791 (internal quotation marks omitted); *see also United States v. Haddock*, 12 F.3d 950, 956 (10th Cir. 1993) ("The Sixth Amendment does not guarantee an errorless trial, and prevailing professional norms do not require perfection at trial."). Additionally, it is common sense that counsel cannot be ineffective for failing to raise a meritless issue. *United States v. Dixon*, 1 F.3d 1080, 1083 n.5 (10th Cir. 1993), *abrogated on other grounds by Florida v. White*, 526 U.S. 559 (1999).

I find that Duran's first claim of ineffective assistance in this section fails because the argument his counsel did not raise would have had no merit. Duran contends that his counsel should have argued to the trial judge, as Duran did in his brief on direct appeal, that the blood found in Duran's truck became "lost" when it was not tested before trial and that, due to the absence of such "lost" evidence, his charges should have been dismissed. *See Doc. 10*, Ex. 2 at 26-27. Had Duran's counsel made this argument, however, it would have been quickly dismissed because, among other reasons, the blood was not lost and could still have been tested by either side.

Ths substance of Duran's second claim in this section merely rehashes his claims that he and Finnell were treated unequally on the stand and that his counsel was ineffective in his cross-examination of Finnell. I have already addressed these issues and concluded

that they are without merit.  *See supra* at 65-66, 83-84.  Because Duran's counsel was not ineffective in failing to elicit the name of Finnell's prior felony conviction on cross-examination, it follows that he also was not ineffective in failing to object to his own decision to not elicit the name.

I also find that Duran's third claim in this section is without merit.  The arguments that his counsel did and did not make in trying to admit Kwasigroch's written statement and the statements of Kwasigroch and the "young man" in Officer Rollins' report are a model example of the circumstances in which the Supreme Court has instructed reviewing courts to avoid "intrusive post-trial inquiry."  *Harrington*, 131 S. Ct. at 788.  While Duran's counsel did not argue that the statements should be admitted as present impressions or that their exclusion violated Duran's Fifth and Sixth Amendment rights to a fair trial and to present a defense, he did argue that the statements should be admitted under New Mexico's "catch-all" hearsay exception.  *T1 at 8:55-8:56.*  He also argued that, as an alternative to dismissing the case due to the State's failure to test the blood found in Duran's truck, the trial judge could admit Kwasigroch's statements to rectify the prejudice caused by the absence of the test results at trial.  *T1 at 8:56.*  While these arguments did not prevail before the trial judge, they were unquestionably part of the adversarial process that the right of counsel is meant to protect.  They were also part of the active and capable advocacy that Duran's counsel provided throughout trial.  It was not objectively unreasonable for Duran's counsel to fail to raise every conceivable argument that Duran

99

has come up with after trial.

There is also no indication that these arguments would have been successful before the trial judge or the NMSC on direct appeal. As previously noted, violations of the Fifth and Sixth Amendment rights to a fair trial and to present a defense must be premised on an erroneous exclusion of evidence. *DePetris*, 239 F.3d at 1062. Had Duran's counsel raised these constitutional claims before the trial judge, they would have been denied on direct appeal because the NMSC held that the exclusion of evidence was not improper. *Doc.* 10, Ex. 4 at 13. Had Duran's counsel raised the present sense impression argument at trial, he would have had to show that the statements were "made while the declarant was perceiving the event or condition, or *immediately thereafter.*" NMRA, Rule 11-803(A) (emphasis added). Kwasigroch did not provide his written statement until one week after Gallegos' murder. *Doc. 20*, Ex. 7 at 14. While Officer Rollins did interview Kwasigroch and the "young man" on the night of the murder, he did not arrive at the scene immediately and his report does not indicate when he conducted his interviews. *RP* at 464-465. Without evidence that the statements were made "immediately" after the witnesses perceived the events, the present sense impression argument would almost certainly have been denied.

As for Duran's argument regarding the admission of Officer Rollins' report, I find that it was not objectively unreasonable for Duran's counsel to choose not to admit the report or to believe that the report was wholly excluded. As previously noted, the record indicates that the trial judge meant to exclude Kwasigroch's statement in the report even

100

though he misspoke when ruling.  *See supra* at 36 & n.23.  While the trial judge did not

expressly rule on the statement of the anonymous "young man" in the report after the

prosecutor moved to have it excluded, *T1 at 8:50-8:51*, it would have been reasonable for

Duran's counsel to believe that it had been excluded or would not have been admitted at

trial in light of the trial judge's thorough analysis and exclusion of Kwasigroch's statement.

*T1 at 9:00-9:04*.  The evidentiary value of the report came from these statements, and so

without them the report would have served little purpose.  For this same reason, I also find

there is not a reasonable probability that the result of Duran's trial would have been

different if his counsel had moved to admit Officer Rollins' report.

For the foregoing reasons, I recommend dismissal of this claim.

### 11.  Failure to Conduct a Proper Investigation, Interview Witnesses, Call Witnesses at Trial, and Impeach Prosecution Witnesses

In his final claim, Duran argues that his counsel was ineffective in the manner that

he investigated Duran's case, interviewed witnesses, and called defense witnesses at trial.

Duran argues that he was prejudiced because a better investigation would have allowed

his counsel to preserve the testimony of Kwasigroch before trial, locate the "young man"

referenced in Officer Rollins' report and call him at trial, impeach Officer Yoakum over

misconduct that forced him to resign, and impeach Robert Judd over inconsistencies

between his trial testimony and statements to the police.  *Doc. 20*, Ex. 2 at 17-24, Ex. 3 at 1-2.

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable

decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. However, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* Additionally, "[a]n attorney's decision not to interview witnesses and to rely on other sources of information, if made in the exercise of professional judgment, is not ineffective counsel." *United States v. Glick*, 710 F.2d 639, 644 (10th Cir. 1983) (citation omitted). Lastly, "[w]hen an ineffective assistance claim centers on a failure to investigate and elicit testimony from witnesses, the petitioner must 'demonstrate, with some precision, the content of the testimony they would have given at trial.'" *Martinez v. Tafoya*, 13 F. App'x 873, 877 (10th Cir. 2001) (unpublished) (quoting *Lawrence v. Armontrout*, 900 F.2d 127, 130 (8th Cir. 1990)). The petitioner must then show a reasonable probability that the outcome of the trial would have been different if the testimony had been presented. *See, e.g.*, *United States v. Prows*, 118 F.3d 686, 692 (10th Cir. 1997).

I find that Duran's counsel was not ineffective in his investigation of Duran's case. Duran has submitted a "Case Update" report from a private investigator that was hired by Duran's counsel. *Doc. 20*, Ex. 20, Ex. 8 at 21-35. Although the report indicates that it was updated on September 10, 2005 and largely recounts investigative work that was conducted in early September of 2005, several weeks before Duran's trial, the date of the first draft of the report is December 8, 2004. *Id.* at 21. The report thus establishes that the investigation

began at least nine and a half months before Duran's trial, and possibly sooner.[51]

Duran argues that his counsel did not interview any opposing witnesses before trial, which appears to be supported by the investigator's report. *Doc. 20*, Ex. 8 at 35 (explaining that the investigator tried to subpoena some witnesses for interviews but that the interviews could not be scheduled until the day after Duran's trial would start).  However, it would have been reasonable for Duran's counsel to bypass the interviews and rely on the witnesses' reports and his investigator's analysis.  *Glick*, 710 F.2d at 644.  The report includes a lengthy analysis of all the statements, reports and interviews  provided by the key figures in Duran's case, which Duran's counsel made ample use of at trial.  *Compare, e.g.*, *Doc. 20*, Ex. 8 at 22 (noting that Duran was in jail on July 4, 2003,  the date that Finnell told a grand jury Duran had visited Gallegos' home with a gun), *with T1 at 4:14-4:17* (impeaching Finnell on this fact).  The report also states repeatedly that the investigator requested interviews with some of the witnesses involved with Duran's case, but was "given the runaround between the DA's office and the Police Department for months." *Doc. 20*, Ex. 8 at 29, 34-35.  Duran explained this to the trial judge and argued that Kwasigroch's statements should be admitted as a result.  *T1 at 8:55-8:56*.  Most significant,

---

[51] Duran contends that his counsel "never hired an investigator until December 8, 2004," *Doc. 20*, Ex. 2 at 19, but this is not clear from the report that Duran has provided. The report is dated as "December 8, 2004  Updated September 10, 2005." *Doc. 20*, Ex. 8 at 21.  The report could be a "Case Update" to a report that was initially created on December 8, 2004, which would mean that the investigator was hired before that date.

however, is the fact that the only substantive testimony Duran argues a better investigation

would have made available at trial is that of Kwasigroch, who died unexpectedly at a

young age, and the anonymous "young man," who refused to identify himself even to

Officer Rollins. *RP* at 465. I cannot conclude that counsel was ineffective for failing to plan

for unexpected deaths or for failing to track down a potential witnesses who did not

identify himself and made every effort to avoid contact. *See Doc. 20*, Ex. 8 at 29 (stating that

the investigator could not find any other information on the "young man" in other

reports).[52]   Considering all of these circumstances, I find that Duran's counsel's

investigation as to Kwasigroch and the "young man" was not unreasonable.

I also find that Duran's counsel was not ineffective in his investigation and cross-

examination of Judd and Officer Yoakum. The cross-examination of Judd that Duran says

a better investigation would have enabled is cross-examination that his counsel actually

conducted at trial, to powerful effect. *T1 at 5:45-5:50* (impeaching Judd on the considerable

---

[52] Duran argues that the "unidentified young man would have been fairly simple
to locate as Off. Rollins describes the route to his residence." *Doc. 20*, Ex. 2 at 2
(referencing *RP* at 465). However, the report states only that the "young man" was
found outside a trailer near a street intersection – it does not indicate that the young
man lived there. *RP* at 465. Furthermore, even if the investigator had found and
spoken with the "young man," there is no indication that he would have identified
himself as the individual from the report or provided the same information, since he
was afraid to speak to Officer Rollins. Finally, even if the young man had been obtained
as a defense witness, his testimony – that someone else had observed a dark maroon or
black truck driving around with guns hanging out the windows soon before the
shooting – would likely have been excluded as hearsay. An ineffective assistance claim
cannot be maintained in light of all of these uncertainties.

inconsistencies between his trial testimony and statement to Officer Rollins and getting Judd to admit that he had recently changed his story after speaking with the District Attorney's office).  Duran has therefore not shown a reasonable probability that the result of his trial would have been different if his counsel had interviewed Judd, because his counsel impeached Judd on the exact issues that Duran argues a better investigation and interview would have revealed.  While Duran's counsel did not impeach Officer Yoakum regarding alleged misconduct that led to his resignation, as Duran argues he would have if he had conducted a better investigation, *Doc. 20*, Ex. 2 at 23-24, I again find that Duran was not prejudiced from this lack of cross-examination.  Even if the impeachment had been admitted,[53] it was on a tangential issue and would not have disturbed the jury's view of the considerable circumstantial evidence linking Duran to the murder or the eyewitness testimony of Finnell, Judd, and Lucero.  Additionally, Duran's counsel was able to elicit several favorable admissions from Officer Yoakum during cross-examination, such as the facts that no eyewitnesses actually saw Duran shoot or rob Gallegos, *T3 at 10:52*, no fingerprint analysis was conducted on the bullet casings or the card found near Gallegos'

---

[53] On cross-examination, Duran attempted to introduce this issue himself when he was questioned about the statement he gave Officer Yoakum.  Duran said, "ask him if he knows for intimidation of witness.  He's popular for that.  Isn't that why he lost his job?"  *T3 at 3:31.*  On the prosecutor's request, the judge told the jury to disregard Duran's comments.  *T3 at 3:31.*  This likely occurred because the alleged misconduct that led to Officer Yoakum's resignation appears to have been unrelated to Duran's case.  *Doc. 20*, Ex. 2 at 23-24.

body, *T1 at 11:26-11:27*, and that the blood found on Duran's jackets and shoes was determined to be a positive DNA match to Duran and excluded as a match to Gallegos. *T1 at 10:53-10:54.*

Finally, I find that Duran's counsel was not ineffective with respect to the witnesses he called at trial.  Duran argues that his counsel "did not call a single defense witness at the trial," *Doc. 20*, Ex. 2 at 20, but his counsel called Officer Rollins, Duran's brother as a character witness, and Duran himself.  The only witnesses that Duran argues his counsel would have been able to call if he had conducted a better investigation are Kwasigroch and the anonymous "young man."  For the reasons already given, however, counsel's ultimate failure to obtain the testimony of these potential witnesses does not make out a meritorious claim of ineffective assistance of counsel.

For the foregoing reasons, I recommend dismissal of this claim.

<u>CONCLUSION</u>

After a review on the merits, the Court concludes that Duran has failed to establish that he is entitled to habeas corpus relief on any of his claims.  Accordingly, his claims and his petition should be dismissed with prejudice.

Wherefore, IT IS HEREBY RECOMMENDED THAT:

1.  Duran's motion for an evidentiary hearing (*Doc. 16*) be denied; and

2.  Duran's § 2254 habeas petition (*Doc. 1*) be dismissed with prejudice.

THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). A party must timely file any objections with the Clerk of the District Court if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.

UNITED STATES MAGISTRATE JUDGE